Argued and submitted March 8, 1989, reargued August 14, 1989, the judgment of the circuit court affirmed as to the guilt phase and reversed as to the penalty phase and remanded to the circuit court for resentencing May 10, 1990

# STATE OF OREGON,
*Respondent,*

*v.*

# CHARLES FRANKLIN SMITH,
*Appellant.*

## (TC No. 87CR-0038; SC S34322)

791 P2d 836

Stephen J. Williams, Deputy Public Defender, Salem,

argued and reargued the cause for appellant. With him on the brief were Gary D. Babcock, Public Defender, and John P. Daugirda, Deputy Public Defender, Salem.

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Ann Kelley and Brenda J Peterson, Assistant Attorneys General, Salem. Timothy A. Sylwester, Assistant Attorney General, Salem, reargued the cause for respondent.

Before Peterson, Chief Justice, and Linde,* Carson, Jones,** Gillette, Van Hoomissen, and Fadeley, Justices.

CARSON, J.

Fadeley, J., filed a dissenting opinion.

---

* Linde, J., retired January 31, 1990.
** Jones, J., resigned April 30, 1990.

## CARSON, J.

Defendant, Charles Franklin Smith, was convicted of aggravated felony murder under ORS 163.095(2).[1] After the jury made the requisite findings, he was sentenced to death under ORS 163.150(1)(a).[2] By appeal under ORS 163.150(1)(f),[3] he seeks reversal of his conviction or, alternatively, of his sentence. For the reasons set forth below, we affirm defendant's conviction. However, our decision in *State v. Wagner*, 309 Or 5, 786 P2d 93 (1990), requires that defendant's case be remanded to the circuit court for a new sentencing phase. We have reviewed all of defendant's assignments of error and each argument related thereto, and we address each separately. Any specific argument that we have not addressed

---

[1] ORS 163.095 provides, in part:

" '[A]ggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"* * * * *

"(2)(d) * * * the defendant personally and intentionally committed the homicide under the circumstances set forth in 163.115(1)(b)."

ORS 163.115(1) provides, in part:

"[C]riminal homicide constitutes murder:

"* * * * *

"(b) When it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and in the course of and in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants:

"* * * * *

"(E) Kidnapping in the second degree * * *."

[2] ORS 163.150(1)(a), prior to its amendment in 1989, provided, in part:

"Upon a finding that the defendant is guilty of aggravated murder, the court * * * shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to life imprisonment or death."

This provision was not significantly affected by the substantial revisions to ORS 163.150 made by Oregon Laws 1989, chapter 720, section 2 and chapter 790, section 135b.

[3] ORS 163.150(1)(f) provided:

"The judgment of conviction [of aggravated murder] and sentence of death shall be subject to automatic and direct review by the Supreme Court. The review by the Supreme Court shall have priority over all other cases, and shall be heard in accordance with the rules promulgated by the Supreme Court."

This provision has been renumbered ORS 163.150(1)(g) as a result of amendments made by Oregon Laws 1989, chapter 790, section 135b.

we have determined to be entirely devoid of merit or to be moot.

## THE GUILT PHASE

*Summary of Facts*

The murder victim, 27-year-old Alice Smith, disappeared on November 22, 1986. Her body was found December 20, 1986, near an abandoned dump site.

Defendant, Charles Franklin Smith, the victim's husband of 10 years, lived and was undergoing alcohol therapy at the Coos County Correctional Treatment Facility (the Center) as a condition of his probation for a previous assault conviction. On November 22, 1986, the victim and her sister drove to the Center to pick up defendant. Defendant carried a length of electrical wire, which he said he was going to use to fix the muffler on the victim's car. The victim said there was no need to fix the muffler but defendant insisted, saying that he had planned to fix the muffler and would do so.

From the Center, the three went to the victim's mother's house, where the victim had been living. While there, defendant exchanged words with Stephen Maugh over an alleged affair between Maugh and the victim. After defendant repaired a tire on his step-daughter's bicycle, defendant and the victim drove to the residence of Bob Tavernier where defendant said he wanted to store his tools and fix the muffler. Defendant did unload his tools, but did not fix the muffler. The victim and defendant left the Taverniers' house between 10:45 and 11:00 a.m. Defendant was next seen between 11:30 a.m. and noon. After spending the remainder of the day visiting various friends, he walked back to the Center that evening.

After defendant and the victim left the Taverniers' house, defendant claims that the victim dropped him off at McKay's store, told him that she was going home to take her daughter to a birthday party, and drove away. Defendant claims that to be the last time that he saw her.

When the victim did not return home, friends and family members began searching for her. The victim's automobile was found at the Silver Dollar Tavern, with her car keys and her purse inside. Family members filed a missing

person report with the Coos County Sheriff's Office. The deputies were informed that defendant was the last person seen with the victim.

On December 20, 1986, a man walking his hunting dogs discovered a partially nude female body in a remote area of Coos County close to an abandoned dump site. He observed that the victim's hands and feet were tied behind her back with electrical wire. In the vicinity, officers found a cigarette butt and an empty cigarette package that later was matched to defendant's brand.

On December 23, 1986, the body was positively identified as that of Alice Smith. The cause of death was determined to be exposure.

Defendant was convicted on Count 2 of the indictment, which alleged aggravated felony murder in the course of kidnapping in the second degree. The indictment reads, in part:

"[T]he said Charles Franklin Smith, between or about November 22, 1986 and December 20, 1986 * * * did unlawfully and intentionally commit the crime of Kidnapping in the Second Degree and in the course of and in furtherance of said crime which the said defendant was committing, the said defendant personally and intentionally did cause the death of another human being, to-wit: Alice Lydia Smith, not a participant in the crime, by tieing [sic] her hands and feet together behind her back and leaving her in a remote area to die."

Defendant's first four assignments of error concern the guilt phase of the trial. In these, defendant assigns error to the trial court's admission of evidence regarding: (1) statements made by defendant to deputies; (2) statements made by defendant to his jail cellmate and his cellmate's statements to the deputies; (3) the prison matrix system; and (4) the pregnancy of the victim. Defendant's remaining assignments of error are addressed to the penalty phase.

## FIRST ASSIGNMENT OF ERROR

Defendant first assigns error to the trial court's denial of his motion to suppress statements that he made to detectives on three separate occasions: November 24, December 20, and December 23, 1986. Defendant claims that

admission of these statements violates his right against self-incrimination under Article I, section 12, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution. The admissibility of these statements requires separate inquiries under the Oregon Constitution and the United States Constitution.

## I. Defendant's November 24, 1986, Statements

The trial court made the following findings of fact concerning defendant's November 24 statements:

"On November 24, Detective Adams went to [the Center] to talk to defendant because defendant's wife was missing and he was the last person seen with her. Defendant was not advised of his *Miranda* rights because Detective Adams did not even know if a crime had been committed.

"Defendant was at the Center pursuant to a sentence which required that as a condition of probation he complete the program at the Center. * * *

"The Center is not supervised by the jail and is not a lock-up facility. Persons at the Center may leave at will because the treatment is voluntary. The people in charge of the facility have no authority to make arrests, but they report violations by a person to that person's probation officer. A pass system has been developed at the Center."

### A. Oregon Constitutional Analysis

In determining whether *Miranda*-like warnings[4] were required by the Oregon Constitution, we must assess the extent to which defendant was "in custody." In Oregon, a defendant who is in "full custody" must be given *Miranda*-like warnings prior to questioning. *State v. Magee,* 304 Or 261, 265, 744 P2d 250 (1987). In addition, such warnings may be required in circumstances that, although they do not rise to the level of full custody, create a "setting which judges would and officers should recognize to be 'compelling.' " *Id.* Defendant argues that detectives should have recognized that questioning at the Center was "compelling." For the following reasons, we reject this argument.

Defendant met with the detective in surroundings relatively familiar to defendant. The Center is a voluntary

---

[4] *See Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

facility, not a custodial facility. The detective did not tell defendant that he was a suspect. In fact, on November 24, no crime had surfaced to investigate. The detective merely was gathering information on a missing-person report. Defendant, of his own free will, agreed to meet the detective at the Center; he was free to answer questions, or not to answer, or simply to end the meeting. The record and the findings of the trial court indicate that Detective Adams in no way coerced, compelled, or pressured defendant to answer. We agree with the trial court's conclusion that defendant's surroundings did not rise to the level of custody requiring *Miranda*-like warnings and, accordingly, that admission of statements made at that time did not violate defendant's rights under Article I, section 12.

### B. Federal Constitutional Analysis

■ ■   Under the United States Constitution, *Miranda* warnings must be given when a person is "in custody," *i.e.,* when a person's freedom has been "significantly restrained," even if the person is in his or her own home or other familiar surroundings. *Oregon v. Elstad,* 470 US 298, 309, 105 S Ct 1285, 84 L Ed 2d 222 (1985). Conversely, *Miranda* warnings are not required when the person is not in custody, even if—for example—the questioning occurs in a police station. *Oregon v. Mathiason,* 429 US 492, 495, 97 S Ct 711, 50 L Ed 2d 714 (1977). Defendant asserts that he was "in custody" on November 24. The trial court, citing *Mathiason,* concluded that defendant was not in custody.

■   In *Mathiason,* the United States Supreme Court determined that the defendant was not in custody when he voluntarily came to the police station where police questioned him about a burglary:

"The defendant was told he was not under arrest. The door was closed. The [officer and the defendant] sat across a desk. * * * The officer told defendant he wanted to talk to him about a burglary and that his truthfulness would possibly be considered by the district attorney or judge. The officer further advised that the police believed defendant was involved in the burglary and [falsely stated that] defendant's fingerprints were found at the scene." 429 US at 493 (quoting *State v. Mathiason,* 275 Or 1, 3-4, 549 P2d 673 (1976)).

The facts in *Mathiason* allow for a stronger argument that the defendant was in custody than the facts presented

here. In this case, the detective questioned defendant in surroundings relatively familiar to him. Defendant was not a suspect. Certainly, defendant was not confronted by false evidence against him. Moreover, the facts stated above regarding the state constitutional analysis bear also on the issue of custody for federal purposes. Defendant was not placed under arrest, was free to refuse to answer questions, and was free to end the meeting.

Nonetheless, defendant attempts to parlay his state-sponsored residence at the Center into a finding that he was in custody during the November 24 questioning. In doing so, he points exclusively to his relative inability to leave the Center. However, the source of this inability was not Detective Adams; defendant could not leave the Center because leaving might violate defendant's separate probation agreement with the state. Further, as the state points out, defendant could have left the *room* without leaving the Center. By leaving the room, defendant could have terminated the interview without violating any condition of his probation. Defendant's voluntary, albeit state-sponsored, residence in the Center did not itself create a custodial situation for *Miranda* purposes.

Again, we agree with the trial court's conclusion that defendant's November 24, 1986, statements were voluntarily given in a setting that did not require *Miranda* warnings, under either the state or federal constitutions. The trial court correctly denied defendant's motion to suppress these statements.

## II. *Defendant's December 20, 1986, Statements*

The trial court made the following findings of fact regarding the December 20, 1986, statements:

"On December 20, 1986, detectives Benson and Dinsmore were looking for defendant because they thought his wife's body had been found. Between November 24, 1986, and the time the body was found on December 20, 1986, there had been reports that defendant's wife had been seen alive and was staying in the Lakeside area of Coos County.

"The detectives could not find defendant and so drove to the Tavernier residence to talk to Mr. Tavernier. Upon arrival at the residence, the detectives discovered the defendant was present. Defendant was read his *Miranda* rights which he

understood and agreed to accompany the detectives back to the police station.

"Defendant was not arrested and was taken back to the Center at the end of the interview which was terminated because defendant said he was tired. At one point during the interview detective Dinsmore made a statement to the effect that if defendant had killed his wife because he found out she was having an affair with another man, it might be manslaughter and not murder to which defendant replied that he had nothing to say."

Defendant advances three arguments concerning his meeting with detectives on December 20, 1986. First, defendant argues that he was in custody when he accompanied detectives to the police station. The trial court found that "as with the [November 24] statement given by defendant, there was no custody." However, we need not address the custody issue in the context of the December 20 statements. Because defendant was given *Miranda* warnings prior to any questioning and he agreed to talk with the detectives, his statements are admissible even if given while in custody.

Second, defendant argues that, even though detectives administered *Miranda* warnings, those warnings were insufficient to remove the "taint" of the prior illegal interrogation. We stated earlier that the November 24 questioning was not improper. Therefore, there was no "taint" to carry forward, and the November 24 questioning is therefore irrelevant to a determination of the admissibility of the December 20 statements.

Finally, defendant contends that he invoked his right to remain silent during the December 20 interview when he said, "I have nothing to say" in response to a detective's hypothetical description of how he might have killed his wife. Based on the context in which the remark was made, the trial court concluded that defendant had not invoked his right to remain silent. Rather, the trial court concluded, defendant merely exercised his right to answer some questions and not to answer others. *See State v. Kell,* 303 Or 89, 99, 734 P2d 334 (1987) ("Defendant was entitled to pick and choose what he wished to talk about.").

We agree with the trial court's conclusion. We find nothing which suggests that detectives persisted "in repeated

efforts to wear down [defendant's] resistance and make him change his mind." *State v. Foster,* 288 Or 649, 656, 607 P2d 173 (1980) (quoting *Michigan v. Mosley,* 423 US 96, 105-06, 96 S Ct 321, 46 L Ed 2d 313 (1975)). Indeed, when defendant later said he was tired, the detectives terminated the interview and drove defendant back to the Center.

Defendant's December 20 statements were not obtained in violation of Article I, section 12, or in violation of the Fifth Amendment; the trial court correctly denied defendant's motion to suppress the December 20 statements.

*III. Defendant's December 23, 1986, Statements*

■ The trial court made the following findings of fact and conclusions of law regarding the December 23 statements:

"Detectives Dinsmore and Adams went to the Center on December 23, 1986, to again talk to defendant because the body had positively been identified as that of defendant's wife. Defendant was not readvised of his *Miranda* rights, but he was not arrested. Although it is clear by this time that defendant was being questioned as a suspect, he could have terminated the interview and left and although he was at the Center as a condition of probation, he had signed an agreement stating he was there voluntarily, and, in fact, at times had left the Center on passes. Weighing the facts does not lead to the conclusion that defendant was in custody especially in light of the fact that as with the previous two interviews, defendant was not arrested. Since he was not in custody, *Miranda* warnings were not necessary, and the statements of defendant will not be suppressed."

The circumstances surrounding the December 23 questioning were nearly identical to the circumstances surrounding the November 24 questioning, which we have found to be noncustodial both for state and for federal purposes. The only difference is, that by December 23, defendant had been identified as the primary suspect in his wife's death.

This difference is legally insignificant. That the deputies were now concentrating on defendant as a suspect does not inherently create a "compelling" setting for Oregon constitutional purposes, *see State v. Magee, supra,* nor does it constitute custody for federal constitutional purposes. *See Berkemer v. McCarty,* 468 US 420, 442, 104 S Ct 3138, 82 L Ed

2d 317 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."). *See also Beckwith v. United States*, 425 US 341, 96 S Ct 1612, 48 L Ed 2d 1 (1976). The questioning of December 23 did not require *Miranda* warnings and the trial judge properly refused to suppress defendant's statements made on that date.

To summarize, the trial court correctly concluded that defendant's November 24, December 20, and December 23, 1986, statements were not obtained in violation of either Article I, section 12, of the Oregon Constitution or the Fifth Amendment to the United States Constitution. Therefore, the trial court properly denied defendant's motion to suppress these statements.

## SECOND ASSIGNMENT OF ERROR

Defendant's next assignment of error is that "[t]he trial court erred in denying defendant's motion to suppress statements allegedly made to David Jischke by defendant and statements made by David Jischke about defendant."

Defendant argues that he was denied his right not to incriminate himself and his right to counsel by the admission of statements he made to fellow inmate Jischke.[5] The trial court made the following findings of fact:

"On January 14, 1987, David Jischke was lodged in the Coos County Jail for burglary. * * * Eventually, Jischke was placed in the same cell as the defendant, but this was not done * * * for the purpose of eliciting statements from the defendant for the police.

"Over a month [later] Jischke contacted Detective McDaniel about information he had concerning a murder. Both Detectives Dinsmore and McDaniel talked to Jischke who gave them information about defendant. No deals were made with Jischke and Jischke was told not to ask questions and that he was not working for the police.

---

[5] Jischke testified that he had heard defendant: (1) telephone defense witnesses and discuss alibi times; (2) admit knowing Alice Smith was pregnant, hogtying her, and parking her car at the Silver Dollar; (3) describe the crime scene; (4) admit previously beating his wife; and, (5) threaten to kill his mother-in-law and to assault Steven Maugh.

"* * * * *

"Jischke felt that information he gave to police might be helpful to them and might assist him in the future, but he did not ask for any deals. * * * He decided to tell police about defendant's statements because of the manner in which the murder was committed.

"Detective McDaniel * * * appeared at Jischke's sentencing and told the court that Jischke was of assistance in recovering property from the burglary Jischke committed. The District Attorney told the court that Jischke had supplied information about a murder case. All information Jischke supplied to police about defendant came from contacts before Jischke's sentencing. Jischke received a five year sentence and had a matrix of 32-44 months."

This assignment of error raises the issue under what circumstances a private citizen may be considered a "police agent." If Jischke was not acting as a police agent, statements made to him were not subject to exclusion pursuant to Article I, section 11, of the Oregon Constitution or the Sixth Amendment. Conversely, if he was a police agent, defendant's right to counsel and right against self-incrimination may have been violated.

■■ Although this court previously has not addressed the admissibility of statements made to "jailhouse informants," the Court of Appeals has done so. In *State v. Lowry,* 37 Or App 641, 652, 588 P2d 623 (1978), *rev den* 285 Or 195 (1979), the court noted that "[n]o hard and fast rule has been established for determining when official involvement is sufficient to bring the exclusionary rule into effect. Each case must be evaluated on its own facts." We adopt the rule, as stated by the Court of Appeals, that "if the police were directly or indirectly involved to a sufficient extent in initiating, planning, controlling or supporting [the informant's] activities, the exclusionary protection would apply." 37 Or App at 651.

*Lowry* involved an inmate named Reed, a veteran "stool pigeon [who had] survived for years by (and in spite of) providing information to various police and penal authorities." 37 Or App at 643. The police encouraged Reed to talk to "Mr. X," a fellow inmate, about an unsolved murder. In addition to talking with Mr. X, Reed also talked with the defendant, Lowry. Reed told the police about Lowry's admissions. The police discouraged Reed and specifically told him

not "to go in there and start asking a whole bunch of questions of anybody." *Id.* at 646. Despite this warning, Reed continued to talk to Lowry. Reed sent notes to the police regarding Lowry's statements. The police did not respond. Ultimately, however, the police encouraged Reed to talk to Lowry, delayed Reed's transfer to a federal penitentiary, and paid him for a taped statement. *Id.* at 649.

The *Lowry* court held that Reed was not a "police agent" until the police actively encouraged him to elicit information from Lowry. At that point, the police became a party to the evidence gathering, and Reed was elevated to the status of police agent regarding Lowry. However, all information gathered by Reed prior to this specific police encouragement was admissible because Reed was acting solely as a private citizen, on his own initiative, and for his own reasons. *Id.* at 654.

In this case, defendant argues that his statements should be treated like those excluded in *Lowry*. However, the statements relayed by Jischke to the sheriff's deputies are more akin to those admitted in *Lowry*. Like Reed, Jischke initiated contact with the deputies and told them about defendant's statements. The deputies told Jischke that if he heard something and wanted to pass it along, he could, but he was not required to do so. Jischke was instructed not to question defendant. Unlike Reed, Jischke complied with this directive. He asked defendant clarifying questions only if he did not understand what defendant was telling him.

The sheriff's deputies in this case made no deals with Jischke, paid him no money, and offered him no encouragement; nor did Jischke request any. Without prompting, he sent letters to the deputies outlining defendant's unsolicited statements. Jischke testified that his motivation for his information gathering was his revulsion at the manner in which the victim was killed. Jischke also testified that he harbored only the barest hope that his helpfulness would benefit him.

Defendant argues that the deputies actively encouraged Jischke to question defendant, and that they implied that they would help Jischke with his burglary charge. Defendant points out that Detective McDaniel appeared at Jischke's sentencing hearing, where the court was informed that Jischke had helped the deputies in a murder investigation. However,

Jischke was unaware that this would occur, and he gathered all information prior to his sentencing. The sheriff's deputies in this case were not "directly or indirectly involved to a sufficient extent in initiating, planning, controlling or supporting" Jischke's activities to render him their agent. The trial court correctly found that Jischke's information gathering was not at the behest of sheriff's deputies. Accordingly, Jischke's actions did not violate defendant's Article I, section 11, rights.

Our holding is consistent with the United States Supreme Court's interpretation of the Sixth Amendment in this context. In *Kuhlman v. Wilson,* 477 US 436, 106 S Ct 2616, 91 L Ed 2d 364 (1986), the government instructed the inmate informant to listen to the defendant, but not to ask questions, a directive with which the informant complied. After reviewing the Court's decisions in this area[6] Justice Powell summarized:

> "[T]he primary concern of the *Massiah* [377 US 201, 84 S Ct 1199, 12 L Ed 2d 246 (1964)] line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since 'the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached,' a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." 477 US at 459. (Citations omitted.)

In this case, Jischke's activities clearly did not constitute "the equivalent of direct police interrogation." The trial court properly denied defendant's motion to suppress statements made to Jischke.

---

[6] *See Maine v. Moulton,* 474 US 159, 106 S Ct 477, 88 L Ed 2d 481 (1985); *United States v. Henry,* 447 US 264, 100 S Ct 2183, 65 L Ed 2d 115 (1980); *Massiah v. United States,* 377 US 201, 84 S Ct 1199, 12 L Ed 2d 246 (1964).

## THIRD ASSIGNMENT OF ERROR

■ Defendant's third assignment of error is that "[t]he trial court (a) erred in overruling defendant's objection to William Beers' testimony about the matrix system of early release and (b) erred in failing *sua sponte* to grant a mistrial based upon Beers' testimony concerning possible early release for first degree murderers."

One of the issues raised during Jischke's testimony was his motivation for gathering information from defendant. Because one of the sheriff's deputies to whom Jischke had passed information appeared at his sentencing and reported Jischke's assistance, there was an issue about whether Jischke had been offered a "deal" by the district attorney. After some general questioning on direct examination by the state about Jischke's protective custody, the following exchange took place between the district attorney and Jischke:

"Q  Did you receive a five-year sentence on your burglary charge?

"A  Yes, sir.

"Q  Do you recall what your matrix was?

"A  Uh, 32 to 40 months, I believe. That is — I am going by memory.

"Q  Did the matrix — well, never mind."

Defense counsel did not object.

On cross-examination, defense counsel sought to demonstrate that Jischke provided information about defendant in exchange for a reduction in his sentence on the burglary conviction. Such a showing would be relevant both to Jischke's credibility and to the issue of whether he was acting as a police agent—the issue discussed above in response to defendant's second assignment of error. The following exchange took place between defense counsel and Jischke:

"Q  You were told that you were facing 20 years, possibly, in prison with a possibility of a $100,000 fine, is that correct?

"A  Yes.

"Q  You were quite concerned about that, were you not?

"A  Yes.

"Q  And you hoped that you could get some help from the police and others to reduce that crime, is that not correct?

"A  No, it's not true.

"Q  You did not want it reduced?

"A  I didn't expect it to get reduced.

"Q  When you were sentenced, Mr. Jischke, what sentence were you given?

"A  Five years."

Defense counsel also brought out the fact that Jischke's presentence report recommended a sentence of 20 years.

The state responded by calling Beers, supervisor for the Oregon State Corrections Division Parole and Probation office in Coquille. Over defense counsel's objection, Beers described the operation of the matrix system, pointing out that the actual time of incarceration is determined by a prisoner's position in the matrix and not by the length of the sentence imposed by the judge. Beers testified that, under the matrix system, Jischke's period of incarceration would be 32 to 44 months regardless of whether the sentence imposed by the judge was five years or 20 years.

In response to the prosecutor's request that Beers describe the operation of the matrix system, Beers began with the following statement:

"All right. In Oregon we have laws that people break and they come to court and they get convicted and they get sent to the penitentiary some times [*sic*] and the judges have a whole — *like on a sentence on Murder in the First Degree, they can sentence that individual to prison for anywhere from one year to 20 years,* and there is a variety of the way things are done around the State." (Emphasis added.)

Defendant argues that Beers's testimony was irrelevant, and thus inadmissible, under OEC 402. He argues further that the reference to first degree murder[7] was prejudicial as it could lead the jury to the conclusion that *defendant* could obtain early release and that the Board of Parole—and not the

---

[7] There is no crime of "first degree murder" in Oregon. Further, no form of murder carries a sentence of one to 20 years.

jury—was responsible for the final sentencing decision of *defendant.*

Beers's testimony was relevant both to the issue of Jischke's credibility and to the issue of whether Jischke had a "deal" with the state and was acting as the state's agent. The extremely remote possibility[8] that the jury would take Beers's testimony into consideration in determining defendant's guilt or sentence was rendered even more unlikely by the trial court's cautionary instruction that the jury was to consider Beers's testimony "for one purpose only, and that is for assessing the credibility of Mr. Jischke." The probative value of Beers's testimony was not "substantially outweighed" by the "danger of unfair prejudice, confusion of the issues, or misleading the jury." OEC 403. The evidence was properly admitted.

## FOURTH ASSIGNMENT OF ERROR

Defendant next argues that "[t]he trial court (a) erred in denying defendant's motion for mistrial and (b) erred in allowing the state to introduce extensive evidence of the victim's pregnancy and the death of the fetus."

The issue of whether, and to what extent, evidence of the victim's pregnancy was admissible evoked numerous objections and extended argument by counsel at trial. That the victim was pregnant at the time she was murdered was first brought to the jury's attention by defendant's mother, the state's first witness. In response to the prosecutor's questioning about how she found out about the victim's disappearance, defendant's mother replied that defendant had telephoned her and told her that the victim was missing and that defendant had no idea where she was. The following then took place:

> "Q [Prosecutor]: Okay. Did he posit any theories or did he give any suggestions where she might be?

---

[8] As the state points out, the jury would have to reason as follows:

"* * * The jury learned from Beers that persons serving sentences of imprisonment can be paroled regardless of the ostensible sentence imposed by the sentencing court; the penalty for first degree murder is one to 20 years; aggravated murder sounds like first degree murder; the penalty for aggravated murder therefore is one to 20 years or a death sentence; and in order to reliably protect society from defendant, the jury would be inclined to impose a death sentence rather than risk defendant's parole if a life sentence were imposed."

"A    He said he thought she went away to have an abortion."

Defense counsel promptly objected and moved for a mistrial. The trial court sustained the objection on relevancy grounds, but noted (out of the jury's presence) that the pregnancy evidence might be relevant later in the trial. The court denied the motion for a mistrial.

The next reference to the victim's pregnancy was contained in the autopsy report relied upon by the state's expert witness. The witness did not discuss the pregnancy, but the report was admitted without objection.

Later in the trial, the state sought to have Stephen Maugh testify that defendant knew about the victim's pregnancy the day after her disappearance. Defense counsel again objected, arguing that evidence of pregnancy was irrelevant and highly prejudicial. However, the court determined that the evidence was relevant to defendant's motive, and overruled the objection.

Subsequently, evidence regarding the victim's pregnancy was admitted on numerous other occasions. Defendant raised no objection to these later references.

Initially, we recognize the potential emotional impact that evidence of a victim's pregnancy may have upon a jury. Yet the narrow legal issue we address is whether the trial court committed reversible error by admitting any of or all the testimony which established that the victim was pregnant when she died.

It appears that defendant's argument is two-fold: First, the evidence was irrelevant, and second, even if the evidence was relevant, it was sufficiently prejudicial that it should have been excluded. Defendant argues that the gravity of this alleged error is such that his conviction must be reversed.

### I.    Relevancy

Only relevant evidence is admissible. OEC 402. Relevant evidence is evidence having "*any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the

evidence." OEC 401. (Emphasis added.) The trial court concluded that the evidence of the victim's pregnancy was relevant to prove defendant's motive. We agree.

Prior to his wife's murder, defendant had demonstrated on numerous occasions a strong proprietary attitude toward her. The record was replete with evidence of defendant's expressed intention to kill the victim in precisely the rather unusual manner in which she was killed. As demonstrated by his repeated mistreatment of women, defendant had throughout his life maintained extremely misogynic attitudes. Defendant had threatened to "get even" with the victim because of his belief that she was having an affair. As the trial court noted, the fact of the victim's pregnancy would indicate to defendant that she was indeed having an affair. Thus, in the context of this murder, evidence of the victim's pregnancy clearly would have a "tendency to make the existence of [defendant's motive] more probable than it would be without the evidence."

Although there was conflicting evidence regarding the exact time at which defendant became aware of the victim's pregnancy, it consistently was the state's position that even if the knowledge was obtained the day after the victim's disappearance (which is the *latest* time the evidence demonstrates), it was relevant because defendant could have rescued the victim at any time before her death. We agree.

## II. *Probative Value vs. Prejudicial Effect*

Even though evidence is relevant, OEC 403 provides that it may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." Although defendant argues that the "repeated interjection of [the victim's pregnancy] into the trial created undue prejudice against defendant and he was denied a fair trial," he does not explain how the undue prejudice comes about.

Although admission of evidence of the victim's pregnancy was *prejudicial* to defendant's case, that is the beginning rather than the end of an OEC 403 analysis. First, we must inquire whether admission of the evidence creates a danger of *unfair* prejudice. Second, even if that danger exists,

the evidence is still admissible unless that danger *substantially outweighs* the evidence's probative value. In this case, evidence of the victim's pregnancy is highly probative of defendant's motive and there is no indication that its admission created a danger of unfair prejudice. We see no abuse of discretion in the trial court's decision to allow the evidence and to deny defendant's motion for a mistrial. *See State v. Johns,* 301 Or 535, 559, 725 P2d 312 (1986) ("We defer to the veteran trial judge who was better able to decide the evidence's effect on the jury after hearing and observing the many witnesses throughout the lengthy trial.").

## THE PENALTY PHASE

### *Defendant's Background*

Defendant's life has been, his attorney argued to the jury, "a miserable failure." Defendant has a long history of violence and abusive behavior, especially toward women. He was physically and emotionally abusive of his first wife, severely beating her on numerous occasions, threatening to throw acid in her face, threatening to kill her, and causing her miscarriage. Defendant's treatment of his second wife was equally abhorrent, including one incident where he choked her unconscious and poured gasoline down her throat, with the intention of lighting it. That marriage lasted six weeks.

Defendant married the victim, his third wife, when she was 16 or 17 years old. Throughout their 10-year marriage, he beat her, abused her, and threatened to kill her in a continuing pattern of extreme violence. Defendant referred to the victim as a "whore" and a "slut" and said that she would "get it" some day. He repeatedly promised to tie her up and leave her somewhere to die. On at least one occasion, defendant had hogtied the victim and beaten her. During his marriage to the victim, defendant sexually assaulted several other women, including a babysitter and the victim's sisters. Defendant also was abusive of animals; he killed six of his first wife's ducklings by throwing them against a tree in her presence, he severely beat a dog that got in the way of his bicycle, he threw a kitten into a burning woodstove, and he kicked the victim's puppy to death.

Defendant's fifth through tenth assignments of error concern the penalty phase of his trial. Although we already

have determined that this case must be remanded for a new penalty phase determination for the reasons stated in *State v. Wagner, supra,* we nonetheless address those issues that are likely to arise on remand, or that have a broad application in this context.

## FIFTH ASSIGNMENT OF ERROR

Defendant contends that "[t]he trial court erred in denying defendant's two motions for mistrial and the motion for new trial."

There are two portions of the state's closing penalty phase argument which are the subject of this assignment of error. Early in the state's closing argument, the following transpired:

"[Prosecutor:] May it please the Court, counsel, ladies and gentlemen: I will not make a personal appeal like that. I will make an appeal on behalf of the people of Oregon, and I think that's most proper in this case.

"I told you that I thought Mr. Lesan would say what he said, and that is that you have to predict that the defendant will do something, but that's not what the statute says. Would he, if he were out there right now, if given the chance. He wants to assume that you have already made the decision of life. That's not what you are to do.

"*And even if we took his assumption that the defendant was in the penitentiary, we know people are paroled out of there* and —

"[Defense Attorney:] Objection, Your Honor. I move to strike and —

"The Court: Sustained.

"[Defense Attorney:] I would ask to take the matter up out of the presence of the jury and would move for a mistrial, Your Honor.

"The Court: That remark, ladies and gentlemen, will be stricken from the record. You are not to consider or discuss that in any way.

"[Prosecutor]: May I discuss that with the Court, Your Honor?

"The Court: No. You may continue with your argument." (Emphasis added.)

Later, the state made the following appeal:

"[Prosecutor]: * * * You were out there in that hole [referring to the jury view of the crime scene], an overcast, dark, wet day. What a place. Alice Smith was bound behind her back with her feet tied, hogtied together, laying down in that hole, almost so you couldn't see her because the huckleberry brush you saw had been cut out when you were there, but she couldn't be seen except ten feet away.

"If you think about her for a moment you must know that she would have cried out as long as she could. She would have sobbed. *She would have thought of * * * her ten-year-old daughter that waited at home to take her to a slumber party.*

"*She would have thought of that baby she carried with her* that the defendant knew about and that the defendant has killed also. *Now, this isn't a double homicide because our statute requires that to be a homicide a person be born and alive —*

"[Defense Counsel]: (Interposing) I am going to object to this line of argument, Your Honor, and move again for a mistrial.

"The Court: I'll sustain the objection.

"That will be stricken from the record, ladies and gentlemen.

"[Prosecutor]: But that's an aggravating factor in this case.

"[Defense Counsel]: (Interposing) Objection, Your Honor.

"The Court: Sustained.

"That is stricken from the record.

"[Prosecutor]: *She thought about the family that loved her.*

"[Defense Counsel]: (Interposing) I am going to object to the whole line of argument. We are speculating. I think it is irrelevant and I think it is improper.

"The Court: Sustained." (Emphasis added.)

Following the state's argument, and out of the jury's presence, defense counsel moved for a mistrial. After the death sentence was imposed by the jury, defendant filed a written motion for a new trial[9] based upon the prosecutor's

---

[9] We interpret this as a renewal and consolidation of defendant's previous oral motions for mistrial.

references to defendant's possible parole, the victim's last thoughts, and the death of the fetus. In denying defendant's motion, the trial court produced a lengthy, carefully considered written opinion supporting its decision. Defendant assigns error to the trial court's refusal to grant the oral motions for mistrial and the later written motion for a new trial.

*Standard of Review*

Our scope of review on the issue of whether a mistrial should have been declared is one of abuse of discretion: "We have consistently held that a motion for a mistrial is addressed to the sound discretion of the trial judge." *State v. Jones,* 242 Or 427, 433, 410 P2d 219 (1966). *See State v. Farrar,* 309 Or 132, 164, 786 P2d 161 (1990) (Trial judge is in the best position to "assess and rectify the potential prejudice to the defendant."). The question thus is not whether this court would have granted a new trial to defendant, but whether the trial court abused its discretion in refusing to do so. Even if we find the prosecutor's remarks to be improper, tasteless, or inappropriate, we will not find an abuse of discretion in the trial court's denial of the motion for a mistrial unless the effect of the prosecutor's remarks is to deny a defendant a fair trial. *State v. Hoffman,* 236 Or 98, 108, 385 P2d 741 (1963). These same principles apply to the determination of whether a defendant in a capital case is entitled to a new penalty phase.[10]

*Reference to Parole*

Defendant argues first that the prosecutor's reference to parole was unfairly prejudicial because it increased the likelihood that the jury would vote in favor of the death penalty to ensure that defendant would not be paroled. Defendant also argues that the reference violated the trial judge's earlier directive that the prosecutor should not argue that defendant could be paroled and the defense should not argue that he would be in prison for the rest of his life.

Defendant relies upon *State v. Leland,* 190 Or 598, 227 P2d 785 (1951), *aff'd sub nom Leland v. Oregon,* 343 US

---

[10] We note that error in the penalty phase of a capital case normally does not require a new guilt phase proceeding. *State v. Wagner,* 309 Or 5, 786 P2d 93 (1990). *See* ORS 163.150(5)(a).

790, 72 S Ct 1002, 96 L Ed 1302 (1952). In *Leland,* during *voir dire,* both the prosecutor and the court referred to the possibility of the defendant being paroled. In its final instructions to the jury, however, the *Leland* trial court instructed the jury that "life imprisonment means imprisonment for life." 190 Or at 623. On appeal, this instruction was held to be sufficient to cure[11] the earlier references to parole.

Defendant argues that the prosecutor's remarks about parole unfairly interjected the possibility of defendant's early release, contrary to the holding in *Leland.* Defendant argues further that, unlike *Leland,* the cautionary instruction[12] did not cure the unfair prejudice.

During the colloquy between the court and the prosecutor after the jury was excused, the prosecutor explained that his reference to parole was not meant to imply that this defendant would ever be paroled. Rather, the prosecutor claimed that he was about to argue that, even if defendant were in jail for life, he could still have an impact on society by enlisting the help of other inmates serving sentences shorter than life. Furthermore, the prosecutor argued that defense counsel "opened the door" by referring to defendant spending the rest of his life in prison.

The trial court determined that the prosecutor's reasoning was "somewhat tenuous," but that he made the argument in good faith. In addition, the judge resolved to give the *Leland* instruction, despite his earlier decision not to do so. In response to defendant's motion for a mistrial, the court stated that the immediate curative instruction, in addition to the

---

[11] A cure was necessary because "[t]he possibility of pardon or parole, purely speculative, should not enter into the jury's deliberations, and was irrelevant on the voir dire examination. We, therefore, agree with counsel for the defendant that it was improper." *State v. Leland,* 190 Or 598, 623, 227 P2d 785 (1951), *aff'd sub nom Leland v. Oregon,* 343 US 790, 72 S Ct 1002, 96 L Ed 1302 (1952).

[12] In addition to the immediate curative instruction set forth in the part of the transcript quoted above, the court later instructed the jury several times to disregard evidence to which the court had sustained objections or which it had ordered stricken. The court also gave the following instruction:

"The defendant in this case has been found guilty of aggravated murder. Oregon law provides that the penalty for aggravated murder shall be either death or imprisonment for life. You must assume these penalties provided for by law mean exactly what they say. You shall not consider or discuss any other possibility or result, because it would require you to speculate, which you cannot do."

later *Leland* instruction, sufficiently cured any unfair prejudice arising out of the reference to parole.

The curative action taken by the trial court in response to the prosecutor's reference to the possibility of parole from a life sentence was stronger and more timely than the action taken in *Leland.* Furthermore, jurors are assumed to have followed their instructions, absent an overwhelming probability that they would be unable to do so. *See Greer v. Miller,* 483 US 756, 766 n 8, 107 S Ct 3102, 97 L Ed 2d 618 (1987). In the instant case, the trial court specifically noted that the jurors were especially conscientious in following the court's instructions. We conclude—assuming that the prosecutor's remarks were improper—that the trial court did not abuse its discretion in refusing to grant defendant's motions based on this remark.

### *The Victim's Last Thoughts*

■    Defendant argues that the prosecutor's unsubstantiated reference to the victim's last thoughts was improper under the United States Supreme Court's holding in *Booth v. Maryland,* 482 US 496, 107 S Ct 2529, 96 L Ed 2d 440 (1987), which prohibits the use of evidence of the impact of a death on the victim's surviving family members. Defendant asserts that the prosecutor's reference improperly shifted the focus onto the victim's surviving daughter and the fetus the victim carried.

Defendant misreads the prohibition of *Booth.* In *Booth,* the Supreme Court held that a Maryland statute which required the capital sentencing jury to consider victim impact evidence created a "constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." 482 US at 503. However, the Court, recognizing that "a defendant's degree of knowledge of the probable consequences of his actions may increase his moral culpability in a constitutionally significant manner," 482 US at 505, also held:

> "Our disapproval of victim impact statements at the sentencing phase of a capital case does not mean, however, that this type of information will never be relevant in any context. Similar types of information may well be admissible because they relate directly to the circumstances of the crime." 482 US at 507 n 10.

The jury repeatedly heard testimony that, on the day of her disappearance, the victim was to have returned home to drive her daughter to a party. And, as discussed above, the jury also heard testimony about the victim's pregnancy. The alleged impropriety lies in the prosecutor's speculation that these two subjects occupied the last thoughts of the victim.

These two references relate much more directly to the circumstances of the crime and defendant's level of culpability than they do to the impact of the death on the victim's family. While we question the propriety of the prosecutor's obvious speculation about what the victim might have been thinking, that speculation was more gratuitous than inflammatory and does not run afoul of the constitutional prohibition of *Booth v. Maryland, supra.* Moreover, the trial court *did* sustain defendant's objections to these statements and ordered them stricken, which actions would have cured any potential defect under *Booth.*

*Reference to Killing the Fetus*

Next, defendant argues that the prosecutor's characterization of the aggravated murder statute as not allowing for a double homicide in this case improperly suggested that defendant had committed a double homicide.

In its opinion addressing defendant's motion for a new trial, the trial court stated the following:

> "* * * To assume that the prosecutor's remark telling the jury they are not dealing with a double homicide somehow is telling the jury it really is a double homicide and the jury should vote to kill the defendant because of it is twisting what was said. Perhaps it would have been better to have stated it differently or to have not said anything at all, but to create error out of factual statements is asking too much."

The trial court also noted that, even assuming that the prosecutor's remarks were improper, the trial court gave several curative instructions, as well as sustaining defendant's objections to these remarks.

In summary, while we can point to situations in which the prosecutor pushed the boundaries of good taste, even if viewed in the aggregate, these indiscretions do not tip the scales to unfairness. The combination of the court's quick intervention when the remarks were made and its later

instructions cured any possibility for error. We conclude that the trial court did not abuse its discretion in denying defendant's motions for mistrial and for a new trial.

## SIXTH ASSIGNMENT OF ERROR

■  Defendant asserts that "[t]he trial court erred in failing to give defendant's requested penalty phase jury instruction No. 2 (modified version of UCrJI No. 1313 on functions of the court and jury) and erred in giving the standard version of UCrJI No. 1313 which included the 'anti-sympathy' instruction." Uniform Criminal Jury Instruction No. 1313, which the trial court used to instruct the jury, states, in part:

"* * * It is your duty to weigh the evidence calmly and dispassionately and to decide this case upon its merits. You are not to allow bias, *sympathy,* or prejudice any place in your deliberations. You must not decide this case on guesswork, conjecture, or speculation." (Emphasis added.)

Defendant contends that "[t]he trial court's admonition that the jury not allow sympathy any place in deliberations" violated his rights under Article I, sections 15 and 16, of the Oregon Constitution and the Eighth and Fourteenth Amendments to the United States Constitution.

We addressed and rejected this argument recently in our decision in *State v. Moen,* 309 Or 45, 86-93, 786 P2d 111 (1990).[13] Our reasoning and conclusion in that case are equally applicable to this case, and we do not repeat that analysis here. We reject defendant's sixth assignment of error.

## SEVENTH ASSIGNMENT OF ERROR

■  Next, defendant claims that "[t]he trial court erred in overruling defendant's penalty phase objections and allowing the introduction of various prior convictions and a probation violation of defendant." During the penalty phase, the state offered the following exhibits as relevant to predicting defendant's future dangerousness, the second question under ORS 163.105(1): sentence order following a conviction for assault in the fourth degree and pointing a firearm at another; motion to revoke probation; sentence on probation violation; promoting gambling conviction; cruelty to animals conviction; and, two driving under the influence of intoxicants convictions.

Defendant objected to admission of all exhibits except the first. The court, after hearing argument from both

---

[13] The assignment of error in *State v. Moen,* 309 Or 45, 86-93, 786 P2d 111 (1990), concerned UCrJI No. 1003, which contains language identical to the language quoted in the text.

parties, admitted all the exhibits except for the "promoting gambling" conviction. Defendant argues that his "intoxicated driving, interaction with animals and poor probation performance" were not directly relevant to the issue of future dangerousness. He argues, additionally, that OEC 403—which requires a judge to weigh the probative value of proffered evidence against the danger of unfair prejudice—should be applied in the penalty phase.

We have addressed this issue repeatedly in recent cases. We consistently have held that ORS 163.150(1), which sets forth the evidence that may be considered in the penalty phase, is to be interpreted broadly, to include even unadjudicated bad acts. As we stated in *State v. Moen, supra:*

> "Obviously, a jury in the penalty phase should have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to the imposition of a death sentence, and the jury should consider the range and severity of a defendant's prior criminal conduct in answering the second question.
>
> "* * * * *
>
> "* * * *Huntley* [302 Or 418, 427, 730 P2d 1234 (1986)] specifically rejected the suggestion that a person's criminal history, whether non-violent or remote in time, is irrelevant in assessing future dangerousness. The same analysis should be applied here on the issue of 'future dangerousness' under a different statute aimed at the same issue." 309 Or at 73.

*See also State v. Montez,* 309 Or 564, 610-11, 789 P2d 1352 (1990); *State v. Wagner,* 305 Or 115, 178, 752 P2d 1136 (1988), *judgment vacated and remanded on other grounds* 492 US ___, 109 S Ct 3235, 106 L Ed 2d 583 (1989).

Further, nothing indicates that the probative value of this evidence was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." OEC 403. The trial court did not err in admitting the state's proffered evidence of defendant's prior criminal conduct. *See State v. Farrar, supra,* 309 Or at 174-75.

## EIGHTH ASSIGNMENT OF ERROR

██ ██ Defendant contends that "[t]he trial court erred in failing to give each of defendant's requested instructions on mitigating evidence." In the instructions rejected by the trial court, defendant sought to present the jury with (1) a list of relevant, nonstatutory mitigating circumstances, and (2) a "fourth question" permitting a life sentence "based upon a broad view of mitigating circumstances." We recently have addressed and resolved these issues elsewhere, and we do not repeat the analysis here. Briefly, we conclude that (1) the trial court did not err in failing to give defendant's requested instruction including a list of nonstatutory mitigating circumstances, *State v. Farrar, supra,* 309 Or at 178-80; and (2) upon resentencing, the court must give a fourth, general mitigation, question as required by *State v. Wagner, supra,* 309 Or at 18-19.

## NINTH ASSIGNMENT OF ERROR

██ Defendant argues that "[t]he trial court erred in failing to give defendant's requested penalty phase instruction No. 8 on the presumption of peacefulness." Defendant contends that "[i]n failing to instruct on the peacefulness presumption, the trial court did not adequately articulate the allocation of the burden and standard of proof." We reject defendant's argument, as we rejected the identical argument in the recent case of *State v. Farrar, supra,* 309 Or at 178. The analysis set forth there is equally applicable here.

## TENTH ASSIGNMENT OF ERROR

"The trial court erred in overruling defendant's demurrer." In this assignment of error, defendant challenges the Oregon death penalty scheme. Defendant concedes in his brief that the issues he raises under this assignment of error are a subset of the issues which we rejected in *Farrar.* In rejecting defendant's arguments, we incorporate our analysis in *State v. Farrar, supra,* 309 Or at 180-89.

## CONCLUSION

We have considered all defendant's assignments of error and every argument made in support of each. We find no error regarding the guilt phase of defendant's trial. However, for the reasons stated in *State v. Wagner, supra,* we reverse the

imposition of the death penalty and remand this case for a new penalty phase. The judgment of the circuit court is affirmed as to the guilt phase and is reversed as to the penalty phase, and the case is remanded to the circuit court for resentencing consistent with this opinion and the opinion in *State v. Wagner, supra.*

**FADELEY, J.,** dissenting.

I dissent for the reasons stated in the dissenting opinions in *State v. Moen,* 309 Or 45, 786 P2d 111 (1990) and *State v. Wagner (II),* 309 Or 5, 786 P2d 93 (1990). I believe the court should assess and fix final punishment now under the statute rather than sending this case back to the trial court for a further penalty phase trial which will lead to further delay and may lead to further appeals costly to the public.