Argued and submitted June 29, affirmed November 21, 1990, reconsideration denied January 16, petition for review denied March 5, 1991 (311 Or 187)

## STATE OF OREGON,
*Respondent,*

*v.*

## SCOTT ALLEN WALKER,
*Appellant.*

## (88-05-40CR; CA A60543)

801 P2d 877

Laura Graser, Portland, argued the cause and filed the brief for appellant.

Michael C. Livingston, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

DE MUNIZ, J.

**DE MUNIZ, J.**

Defendant appeals his conviction for criminally negligent homicide. ORS 163.145. He challenges the trial court's denial of his motion to suppress statements that he made to the police before he was given *"Miranda* warnings." We affirm.

The trial court made cursory findings of fact. From the record, we supplement those findings of fact with historical facts that are undisputed and that support the trial court's ultimate conclusion. *See Ball v. Gladden,* 250 Or 485, 487-88, 443 P2d 621 (1968).

On January 28, 1988, at 10:28 p.m., defendant called the 911 emergency number from his house and reported that his girlfriend had been shot in the head with a shotgun. When the rescue units arrived, he led the fire department personnel into the bedroom where the victim was lying. One of them told him to "sit in the living room and wait."[1] Deputies Tall and Bowman arrived at the scene about 10:45 p.m. They found defendant sitting on a couch in the living room. Tall told defendant "to remain seated and that someone would be talking to him shortly."

Bowman determined that the victim was dead, instructed the fire department personnel to leave the house and told Tall to go outside and talk with them. Bowman informed defendant that he was there to investigate the shooting and asked him for his cooperation; defendant agreed to cooperate. They had a conversation that lasted 10 or 15 minutes. Bowman testified that defendant told him that he and the victim had arrived at their residence that night, had eaten dinner and then had gone into the bedroom and started to "play" with a shotgun. The victim pointed the gun at him "and ordered him onto the bed." She pulled the trigger, but the gun did not fire.

> "Mr. Walker then took the gun and worked the lever action at least twice, and said maybe three times, and at that point he said nothing came out of the gun.

---

[1] Defendant notes that one of the fire department personnel asked him to "tell him what happened" and that defendant replied by giving him "a statement"; however, defendant does not argue that that "statement" should have been suppressed.

"He then pointed the gun at [the victim] and ordered her saying, 'Now it's your turn to get on the bed.'

"* * * * *

"He said that he raised the gun and pulled the trigger. Just prior to him pulling the trigger, he also told me that [the victim] had taken ahold of the barrel and pulled the barrel towards her.

"* * * * *

"He said * * * that he pulled the trigger and the gun discharged."

A fire department chaplain and defendant's parents also came to the house on the evening of the shooting. Neither the chaplain nor the parents were initially allowed to enter the house. Fifteen or 20 minutes after he arrived, the chaplain was allowed to enter the house and to speak with defendant.[2] During that conversation, investigators from the sheriff's office arrived and started to gather evidence.[3]

Detective Danielson arrived at the house at 12:14 a.m. He asked defendant to accompany him to the sheriff's office for an interview, because the house was small, there were a number of people inside and Danielson did not think that it was an appropriate place for an interview. Defendant agreed, indicating that "there was no reason not to[.]"

Defendant and Danielson left the house in Danielson's car,[4] with defendant seated on the passenger side of the front seat. During the trip, Danielson asked defendant if they could stop at a hospital and obtain a blood sample from him. Defendant again responded that "there was no reason not to." Defendant asked Danielson during the trip if he was going to jail. Danielson testified that, before he could respond, defendant answered his own question, indicating that he did

---

[2] Defendant does not argue that the fire department chaplain was acting as an agent of the police; therefore, we do not consider whether it was error to admit any of defendant's statements to him.

[3] They swabbed blood samples from defendant's hands and arms, performed a gunshot residue test and photographed him. He does not argue that that evidence should have been suppressed.

[4] Defendant testified that, as Danielson directed him toward his car, he started to veer toward his mother. Danielson told him that he "needed to come with him." However, defendant did not tell Danielson that he wanted to talk with or go to his mother.

not feel like he was going to jail, because he was not in the back seat of the car and had not been handcuffed. Danielson then told defendant that "he was not under arrest and [they] were merely going to the sheriff's office to obtain a complete statement."

After he arrived at the sheriff's office, defendant was allowed to change clothes and wash blood from his hands. Danielson and Detective Schultze took him into an interview room. At the beginning of the interview, Danielson explained to defendant that the detectives were investigating the victim's death; he was "not under arrest"; he was brought there voluntarily; he was free to go at any time; he could stop talking at any time; and, if he wanted an attorney, he could have one. Among other things, they discussed the events of the evening again. Defendant outlined them basically as he had done previously for Bowman. Danielson testified that, during the interview, defendant was allowed to leave the room several times and to talk to his mother. The taped portion of the interview lasted about half an hour. Defendant left the sheriff's office with his parents at 3:55 a.m.

On January 30, Danielson and Schultze went to defendant's parents' house, where defendant was staying. Defendant's mother answered the door and invited them in. The officers had a conversation with defendant at the dining room table. His father remained at the table during the entire conversation. The detectives left about an hour after they arrived.

On February 2, Danielson called defendant at his parents' house to arrange a videotaped "walk-through of what had happened" at the house where the shooting occurred. Defendant agreed to participate. After meeting defendant at his parents' house, Danielson, Schultze and a technician drove to the scene in one car, while defendant and his mother drove in another. Defendant allowed the police to videotape the "walk-through."

After the videotaping, Danielson asked defendant to accompany them to the sheriff's office for "further questioning." Defendant again replied that "there was no reason not to." He rode to the sheriff's office with his mother. Danielson and Schultze took him into an interview room at the sheriff's office and conducted another recorded interview. Again, they

went through the events of the evening of the shooting. The officers pointed out inconsistencies between defendant's portrayal of the events and facts that they had uncovered during the investigation. That interview lasted about 35 minutes. Danielson eventually left the interview room. After a disagreement with Schultze, defendant indicated that he wanted to leave the room. Schultze allowed him to do so. Defendant found his mother and left with her.

The police did not provide defendant with warnings before any of the interviews. He was indicted for murder on April 25, 1988. Before trial, defendant moved to suppress his pretrial statements. The state agrees that no warnings were given, but contends that none was required.

The trial court concluded that defendant was not in custody when he made the statements and, therefore, that no warnings were required. On appeal, defendant argues that he

"was in custody from the point when Deputy Tall told him to remain seated, and said 'someone would be talking to him shortly.' Deputy Bowman, that 'someone,' was required to give Miranda warnings before he began to question the defendant. Bowman's failure to do so means that all of the defendant's statements from that point on must be suppressed."

Defendant cites both Article I, section 12, of the Oregon Constitution and the Fifth Amendment in support of his argument that his statements should have been suppressed.

■ Under the Oregon Constitution, whether the police must give an individual *Miranda*-like warnings depends on the extent to which that person is in custody when questioned by the police. Warnings are required before questioning a person who is in "full custody" or a "setting which judges would and officers should recognize to be 'compelling.' " *State v. Smith,* 310 Or 1, 7, 791 P2d 836 (1990) (quoting *State v. Magee,* 304 Or 261, 265, 744 P2d 250 (1987)). However, in holding that the setting was not sufficiently compelling, the court, in *State v. Smith, supra,* focused, not only on the defendant's surroundings, but also on the manner of questioning. 310 Or at 7-8.

In *Smith,* the court held that the police did not violate the defendant's right against self-incrimination under Article

I, section 12, in obtaining statements on three separate occasions. The first statement was in an interview by a detective at a county correctional treatment facility (the center), where the defendant was required to complete a treatment program as a condition of probation. The court noted that the center was a voluntary, noncustodial facility, the detective was merely there to investigate a missing-person report and the defendant voluntarily agreed to meet the detective at the center. 310 Or at 7-8. Moreover, the defendant was free to refuse to answer the questions; the detective "in no way coerced, compelled, or pressured defendant to answer." 310 Or at 8.

The detectives gave warnings before the questioning on the second occasion. On the third occasion, two detectives questioned the defendant at the center about a month after the first questioning. The court noted that the circumstances were identical to those of the first interview and found that they were noncustodial, except that the "defendant had been identified as the primary suspect in his wife's death." However, the court held that that fact did not "inherently create a 'compelling' setting for Oregon constitutional purposes[.]" 310 Or at 11.

In contrast, in *State v. Magee,* 304 Or 261, 263, 744 P2d 250 (1987), the defendant came to a police station voluntarily "to ascertain the status of his brother who was in custody." The court held, under Article I, section 12, that

"[w]hen this defendant was told by an officer investigating assault charges that he could not leave the police station because he was involved in [a] fight, this constituted 'custody' adequate to require a warning before questioning." 304 Or at 266.

Defendant here testified that he did not believe that he had any choice regarding whether to answer questions on the night of the shooting. He also testified that he did not feel that he could leave the house, or even the couch, until after Danielson requested that he accompany him to the sheriff's office. Moreover, the police did not tell defendant that his parents were at the scene or that they were denied access to the house. On the other hand, a reasonable person who was the only witness to a fatal shooting would expect to wait at the scene, out of the way of the investigators, and even to accompany officers to the station, until he had been interviewed in the investigation.

The officers requested defendant's cooperation, but they never physically restrained him or told him that he was under arrest. Although another officer was in and out of the room, Bowman was the only officer to question defendant during the first interview; fire department personnel were on the way out, and no other police officers were in the house at the time. There was no indication that defendant could not leave his house after his interview with Bowman, except for circumstances that the police did not control—the house was in a remote location and defendant could not drive. Danielson requested that defendant accompany him to the sheriff's office for an interview, he rode in the front seat of Danielson's car; he was not physically restrained; he was told several times that he was not under arrest; and he was allowed to leave afterwards.

■■ The interview conducted by Danielson and Schultze on January 30 took place at defendant's parents' house with his father present during the interview. Defendant was not under physical restraint, the deputies did not tell him that he was under arrest and they merely requested his cooperation. On February 2, defendant traveled to the scene in his mother's car for the videotaped reenactment and also rode with her to the sheriff's office for the subsequent interview. During the interview, defendant had a disagreement with Schultze, indicated he wanted to leave the room, was permitted to do so and then left the sheriff's office with his mother.

We conclude that, on the night of the shooting, during the interview on January 30 and during the videotaped reenactment and subsequent interview on February 2, the circumstances did not involve custody that required the police to give defendant warnings under the Oregon Constitution. Accordingly, admission of the statements that defendant made at those times did not violate Article I, section 12. *See State v. Smith, supra.*

Defendant was not in custody for federal constitutional purposes on any of the occasions; therefore, we reach the same result under the Fifth Amendment. *Berkemer v. McCarty,* 468 US 420, 441, 104 S Ct 3138, 82 L Ed 2d 317 (1984); *Oregon v. Mathiason,* 429 US 492, 97 S Ct 711, 50 L Ed 2d 714 (1977).

Affirmed.