Argued and submitted November 28, 2001, affirmed February 13, 2002

# STATE OF OREGON,
## *Appellant,*
### *v.*
# JEFF MICHAEL WEROWINSKI,
## *Respondent.*
## 991306; A111307
40 P3d 545

Jonathan Fussner, Assistant Attorney General, argued the cause for appellant. On the brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Janet A. Klapstein, Assistant Attorney General.

Jennelle I. Hall, Deputy Public Defender, argued the cause for respondent. With her on the brief was David E. Groom, Public Defender.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Brewer, Judge.

BREWER, J.

**BREWER, J.**

The state appeals from a pretrial order suppressing statements made by defendant before his arrest on two counts of second-degree assault, ORS 163.175, and one count of fourth-degree assault, ORS 163.160. The issue on appeal is whether defendant made those statements while in custody or under "compelling circumstances" such that *Miranda* warnings relating to self-incrimination were first required under the United States or Oregon Constitutions. We conclude that, although defendant was not in full custody, his statements were made under compelling circumstances. Because Article I, section 12, of the Oregon Constitution, required that defendant first be told of the rights that safeguard him against self-incrimination in such circumstances, *see State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987), we affirm.

The following facts were undisputed or were found by the trial court and are supported by evidence in the record. *See State v. Smith*, 310 Or 1, 791 P2d 836 (1990) (relying on trial court's findings of fact in analysis of custody and compelling circumstances). On October 18, 1999, Officer Swanson was dispatched to the scene of a tavern fight that reportedly involved four people. Swanson called for backup from a block away from the tavern. As he waited, a dispatcher reported that the fight had escalated, and "One of the subjects now has a steel bar and is hitting people with it." From his vantage point, Swanson could see that the fight had moved to the parking lot, where five or six people were yelling. When one person crossed the street away from the parking lot, Swanson stepped out of his car to approach. The person, who was visibly intoxicated, was later identified as defendant's roommate, Julie Moore.

As Swanson reached Moore, Moore lay down on the sidewalk and stated that "they all had guns, and they're gonna kill him." Defendant reached Moore at about the same time, and Swanson asked him what was happening. Defendant told Swanson that no one had a gun or steel bar but that he had had a hammer and that he had hit a person with it. Swanson asked why, and defendant replied, "Well, I was in a

fight, and * * * there was two of them and only one of me."
Defendant was no longer carrying the hammer. Swanson
directed defendant to his patrol car and placed him in the
back seat. On cross-examination, Swanson testified:

> "I do not believe I put him in an escort hold and walked him
> over there, as he was extremely cooperative. I said 'Well,
> let's go over to my patrol car, you can have a seat in there.'
> Just walked over there, is what I recollect."

Swanson noted abrasions on defendant's knees. Swanson
asked defendant if he needed medical attention; defendant
declined. Swanson told defendant that he was not under
arrest, but that he was being detained. "I'm gonna go speak
with everybody and find out what happened here," Swanson
told defendant, "and I'll come back to talk to you again."

Defendant was not handcuffed while he sat in the
back seat of the patrol car. A plexiglass partition separated
the back seat from the front seat, the interior rear doors were
inoperable, and the rear windows could not be opened from
the rear seat.[1] Defendant was able to observe the investiga-
tion scene through the car window. Moore approached the
car, and the two communicated through the window. Moore,
who was yelling, became disruptive and was detained in
another police vehicle. Defendant smoked a cigarette while
he was waiting. Swanson returned briefly to tell defendant
not to smoke in the car. Defendant discarded his cigarette,
and Swanson returned to his investigation.

Approximately 10 to 15 minutes after placing defen-
dant in the patrol car, Swanson returned from interviewing
other participants in the fight. Swanson opened the door but
did not let defendant out of the patrol car. Swanson told
defendant that the other participants had stated that, after
an initial scuffle, defendant obtained a hammer and returned
to the scene, where he hit people with the hammer. Swanson

---

[1] The trial court found that the patrol vehicle "was the usual with no means of
exit because there were no door or window handles." Defendant testified that the
windows were shut throughout his detention. By contrast, Swanson testified that
the rear windows could be partially opened and that defendant's window had been
partially opened as he communicated with Moore. Defendant's testimony that he
and Moore "had to yell through the window" is evidence supporting the trial court's
finding that no rear window handles were available.

asked if the reports were true, and defendant replied that he did not think the fight was over and that his antagonists were still coming after him. Swanson responded, "Everybody else said you got in your vehicle, and you were driving away, and then you got your hammer." Defendant replied, "Yes, that's correct." Swanson then advised defendant of his *Miranda* rights and placed him under arrest. The questioning upon Swanson's return lasted less than one minute.

Defendant was charged with two counts of second-degree assault and one count of fourth-degree assault. He moved to suppress the statements made to Swanson after Swanson returned from interviewing the other participants in the fight, arguing that *Miranda* warnings were required because, at the time of Swanson's questioning, he was either under arrest and in custody or the circumstances were compelling. The trial court suppressed defendant's statements:

> "Where a person is in custody or in a 'setting which judges would and officers should recognize to be "compelling" ' then *Miranda*-like warnings are required to be given. I believe that this is one of those situations and therefore would require that the statements that the defendant made to [Swanson] after he returned to the police vehicle and before the defendant was advised of his rights should be suppressed."

The state appeals from the suppression order.

■ *Miranda* warnings against self-incrimination are required under the Oregon Constitution when a defendant is in full custody or "when circumstances exist which, although they do not rise to the level of full custody, create a setting that is 'compelling.' " *State v. Widerstrom*, 109 Or App 18, 21, 818 P2d 934, *rev den* 312 Or 526 (1991). The state argues that the circumstances of the questioning were not so compelling as to require *Miranda* warnings under the United States and Oregon Constitutions. Defendant responds that *Miranda* warnings were required because he actually was under arrest—and, therefore, in full custody—regardless of Swanson's assurances to the contrary. In the alternative, he argues that the trial court correctly determined that the circumstances were compelling enough to require *Miranda* warnings.

We begin with defendant's contention that, when questioned, he actually was under arrest and in full police custody. The state responds that (1) "arrest" is defined by statute; (2) the definition of "arrest" expressly excludes a "stop"; and (3) defendant's detention in this case fits the statutory definition of a stop.

■■ "A 'stop' as authorized under ORS 131.605 to ORS 131.625 is not an 'arrest.' " ORS 133.005(1). ORS 131.605(6) defines a "stop" as a "temporary restraint of a person's liberty by a peace officer lawfully present in any place." Defendant does not contend that Swanson violated any statutory requirements for the conduct of a stop.[2] Instead, he asserts that the stop was converted to an arrest when he was confined in the back of the locked patrol car. He relies on *State v. Morgan*, 106 Or App 138, 806 P2d 713, *rev den* 312 Or 235 (1991), where this court held that a handcuffed suspect who had been placed by police in the back of a patrol car had been arrested. By extension, defendant argues, his confinement in the back of a patrol car—even without handcuffs—constituted arrest. He notes that an arrest is no less such merely because a police officer has advised a suspect that he has not been arrested. *State v. Koester*, 117 Or App 139, 843 P2d 968 (1992), *rev den* 315 Or 644 (1993).

■■ In *Morgan*, the defendant was stopped after police received a report that "there was possibly a person taking a person from a car or putting a person into a car at gunpoint." 106 Or App at 140. Investigating officers frisked the defendant. The frisk revealed no evidence of a gun. The officers then handcuffed the defendant and placed him in a patrol

---

[2] The conduct of a stop is regulated by ORS 131.615, which provides, in part:

"(1) A peace officer who reasonably suspects that a person has committed or is about to commit a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable if it is limited to:

"(a) The immediate circumstances that aroused the officer's suspicion;

"(b) Other circumstances arising during the course of the detention and inquiry that give rise to a reasonable suspicion of criminal activity; and

"(c) Ensuring the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons."

car. Meanwhile, officers searched the defendant's car and found some bullets inside a zippered eyeglass case, but no gun. An officer then asked the defendant if he had a gun, and the defendant described the exact location of a gun in his car. The officer retrieved the gun. The defendant was charged with and convicted of being a felon in possession of a firearm. On appeal, the defendant conceded that the stop was justified by reasonable suspicion, but he argued that police had lacked probable cause to arrest him. This court held:

> "A stop authorized by ORS 131.605 to ORS 131.625 is not an arrest. ORS 133.005(1). However, even when a stop is authorized, *a restraint that goes beyond the scope of a stop will result in an illegal arrest,* if it is not based on probable cause. The question, then, is whether handcuffing defendant and placing him in the police car resulted in an arrest.
>
> "* * * * *
>
> "* * * The police initially had reasonable suspicion that defendant was armed with a gun and in the course of a possible kidnaping. That suspicion entitled them to take reasonable precautions for their safety. However, once defendant was taken out of the car and frisked, any concern about immediate danger dissipated, especially in light of [the officer's] description of defendant as 'polite and cooperative.' *On these facts, we find that, when defendant was handcuffed and placed in the patrol car, he was arrested within the meaning of ORS 133.005(1)." Id.* at 141-42 (emphasis added; citations omitted).

In subsequent decisions, this court has made clear that *handcuffing* a suspect may be a key factor in transforming the detention associated with a stop into an arrest. *See, e.g., State v. Johnson,* 120 Or App 151, 158, 851 P2d 1160, *rev den* 318 Or 26 (1993) ("Handcuffing [the defendant] constituted an arrest that was not supported by probable cause.") (citing *Morgan,* 106 Or App at 141).[3] Here, however, defendant was *not* handcuffed, and no other evidence suggests that

---

[3] Even the use of handcuffs does not inevitably signify an arrest. *See Johnson,* 120 Or App at 158 ("There may be circumstances in which the interests of officer safety could justify handcuffing a dangerous person who refuses to submit to a frisk during a lawful stop."). However, the presence of handcuffs is an oft-cited factor contributing to the conclusion that a defendant is under arrest rather than merely "stopped." *See, e.g., Koester,* 117 Or App at 142; *Morgan,* 106 Or App at 141.

the level of restraint imposed exceeded the reasonable scope of the stop. Defendant was inebriated when Swanson first encountered him. Swanson placed defendant in the patrol car in the immediate aftermath of a fight in which defendant said he was outnumbered. Defendant acknowledged having brought a hammer to the fight and that the hammer was missing. Moore had indicated that the fight's other participants might be acquiring firearms to attack defendant. The restraint imposed was reasonable in light of Swanson's need to control the scene so that he could investigate the circumstances of the fight that prompted his dispatch to the scene. Because the restraint associated with defendant's detention was authorized under ORS 131.615, the stop was not converted into an arrest. ORS 133.005(1). Accordingly, we conclude that defendant was not under full custodial arrest when he was confined in the patrol car.

■ We turn next to the parties' arguments regarding compelling circumstances. We review for errors of law the trial court's conclusion that the circumstances in this case were "compelling." *State v. Goree*, 151 Or App 621, 637, 950 P2d 919 (1997), *rev den* 327 Or 123 (1998). In determining whether a statement was compelled, "the relevant inquiry is how *a reasonable person in the suspect's position* would have understood the situation." *State v. Clem*, 136 Or App 37, 42, 900 P2d 1064 (1995) (emphasis added). We examine all the circumstances in which the purportedly compelled statements were made. *State v. Prickett*, 324 Or 489, 495, 930 P2d 221 (1997).

■ In support of its contention that defendant's statements were not made under compelling circumstances, the state relies on *State v. Nevel*, 126 Or App 270, 868 P2d 1338 (1994). In *Nevel*, Officer Larson was dispatched to the scene of an automobile accident at which a woman was reported to have been yelling "something to the effect that 'he is stabbing me.' " *Id.* at 272. Larson asked the defendant what had happened, and the defendant told the officer that he and his wife were "having a fight." We described the encounter as follows:

> "Larson asked defendant to sit in the back of his patrol car. Defendant complied. Larson walked over to defendant's wife, who was still in the car, and asked her what had

occurred. She said that she and defendant were in an argument and that he had forced her off the road with his van. Larson then went back to the patrol car and let defendant out. Defendant had spent approximately three minutes in the patrol car." *Id*.

Based on the defendant's appearance and demeanor, Larson concluded that the defendant was under the influence of methamphetamines. Larson asked the defendant how the "dope business" was, and the defendant answered that he "was getting out of the drug business." Larson then asked whether the defendant had any methamphetamines in his van, and the defendant responded that there was one half of one gram, which he volunteered to retrieve for Larson. At trial, the defendant moved to suppress the evidence obtained after Larson began questioning him, arguing that *Miranda* warnings were first required. We affirmed the trial court's refusal to suppress the evidence:

"We conclude that the investigatory detention * * * was as unobtrusive as possible. Although three patrol cars were present, none had on flashing lights, a siren or a spotlight. Defendant was never told that he was under arrest, nor was he handcuffed or frisked. No physical force was employed by any of the officers at any time during the questioning, which lasted only seven minutes. Moreover, Larson's demeanor was casual and polite. He described the conversation during which he asked defendant about the 'dope business' as non-confrontational and 'pretty mellow.' In short, there is no evidence that the interrogation was prolonged or that it took place in an atmosphere with coercive overtones. Accordingly, we conclude that Larson did not violate Article I, section 12, by neglecting to give defendant *Miranda*-like warnings before questioning him." *Id*. at 276-77.

We agree with defendant that *Nevel* is distinguishable from the circumstances here. First, defendant here remained in Swanson's car for "10 to 15 minutes," whereas the defendant in *Nevel* was detained for three minutes. The significance of the length of detention varies depending on the other surrounding circumstances. More significantly, though, Swanson questioned defendant while he remained confined inside the patrol car, whereas the defendant in *Nevel* was questioned outside the patrol car.

 The state correctly observes that the fact that defendant was unable to leave the patrol car is not determinative of the existence of compelling circumstances. "[D]uring a 'stop,' under ORS 131.615, a reasonable person would believe that he is not free to leave. Nonetheless, a valid stop may be followed by an officer's reasonable inquiry, ORS 131.615(1), and generally that inquiry need not be preceded by warnings." *Id.* (citing *State v. Greason*, 106 Or App 529, 533, 809 P2d 695, *rev den* 311 Or 643 (1991)) (internal quotation marks and emphasis omitted). In addition, the stop occurred in a public location, Swanson was the only officer to question defendant, no weapons were drawn, and the conversation was polite. *See Prickett*, 324 Or at 495-96 (noting public nature of stop). However, those factors cannot be considered in isolation from the remaining circumstances.

 Compelling circumstances may exist in various settings. In *Magee*, the defendant voluntarily appeared at a police station to talk to his brother, who had been arrested for his alleged involvement in a fight. 304 Or at 263. The defendant was placed in a separate room at the station and was told to take a seat. He also was told that he was not free to leave. The police then questioned the defendant about his own involvement in the fight. Although the defendant had not been arrested, the Oregon Supreme Court held that the circumstances were sufficiently compelling to require *Miranda* warnings before the defendant was questioned. The court said that "[t]he concept obviously includes extended official detention in a cell *or another enclosure*, with or without booking or deprivation of personal belongings. But an enclosure is not essential * * *." *Id.* at 265 (emphasis added). In reversing the trial court's order denying suppression of the defendant's statements, the court emphasized that the questioning occurred in a police-controlled setting—the police station—and that the defendant was not initially questioned as part of a noncriminal investigation. *Id.* at 264-65.

 In *State v. Rose*, 109 Or App 378, 819 P2d 757 (1991), police stopped a vehicle based on reasonable suspicion that the operator was driving under the influence of intoxicants. When the defendant, a passenger, lifted her purse from the

front seat, the officer noticed a holster underneath. The officer asked the defendant if she had any weapons, and the defendant handed him a pistol that also had been lying beneath her purse. The officer placed the pistol in his belt, then ordered the defendant out of the car. After learning that she had no concealed weapon permit and without first advising the defendant of her *Miranda* rights, the officer asked the defendant if she knew that it was illegal to carry a concealed weapon in a vehicle. *See* ORS 166.250(1). The defendant replied that she had removed the pistol from her purse immediately before the stop. The trial court denied the defendant's motion to suppress her statement. Although we concluded that the error was harmless, we held that the defendant "was then in a 'compelling setting' and that, therefore, warnings were required." *Id.* at 381.

Here, as in *Rose*, the officer had probable cause to arrest defendant for a crime when he questioned him. If anything, the circumstances in *Rose* were less compelling than here because, in *Rose*, the officer questioned the defendant outside any vehicle. However, the officer's order for the defendant to leave her car presents a mirror image of the circumstances here, where the officer directed defendant to enter and remain in a locked patrol car for 10 or 15 minutes while the officer interviewed other people. When the officer returned from those interviews, he physically blocked defendant's egress from the patrol car.[4] The officer then confronted defendant with statements of other combatants and witnesses that incriminated defendant and asked him whether they were true. Considering the totality of the circumstances, a reasonable person in defendant's situation would have understood that he was being questioned under compelling circumstances.[5] *See Magee*, 304 Or at 265. Because *Miranda* warnings were first required, Article I, section 12, of the

---

[4] The circumstances here are unlike those found in *Smith* and *State v. Zelinka*, 130 Or App 464, 882 P2d 624 (1994), *rev den* 320 Or 508 (1995), where the courts concluded that defendants who voluntarily made statements to police officers while in familiar surroundings were not subject to compelling circumstances.

[5] We emphasize the *totality* of the circumstances, because we do not suggest that a single factor among those we have mentioned would, standing alone, require a particular result. *See, e.g., Smith*, 310 Or at 12 (holding that the fact that the defendant was a focal suspect did not "inherently create" a compelling setting for questioning).

Oregon Constitution, requires the suppression of defendant's statements. Our conclusion obviates the need to consider whether the unwarned questioning of defendant violated the Fifth Amendment.

Affirmed.