Argued and submitted April 28, conviction on second count reversed and remanded; otherwise affirmed November 1, 2006, petition for review allowed March 7, 2007 (342 Or 473)

STATE OF OREGON,
*Respondent,*

*v.*

MARTIN ALLEN SHAFF,
*Appellant.*

220317998; A124908

146 P3d 389

Jamesa J. Drake, Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Susan G. Howe, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum,* Judges.

ARMSTRONG, J.

---

* Rosenblum, J., *vice* Richardson, S. J.

### ARMSTRONG, J.

Defendant appeals his convictions of two counts of fourth-degree misdemeanor assault. ORS 163.160. We reject without discussion defendant's assignment of error on the trial court's refusal to give a requested jury instruction on the first count. Defendant also assigns error to the court's denial of his motion to suppress a statement that he made to the police in connection with the second count. We reverse and remand his conviction on the second count and otherwise affirm.

Defendant contends that his statement should be suppressed on the alternative grounds that the police entry into his home did not come within a recognized exception to the warrant requirement and that the police failed to inform him of his *Miranda* rights before he made an inculpatory statement under compelling circumstances. Because we agree with defendant's compelling circumstances argument, we need not consider his argument about the lawfulness of the police entry.

The material facts are undisputed. Two police officers arrived at night at defendant's trailer home in separate patrol cars, police lights and sirens off, to do what they called "a welfare check" based on a report of a 9-1-1 call made by a pizza delivery person. The caller said that a woman who "appeared injured" had answered the door of the trailer to receive a pizza. The officers knocked on the front door and the windows of defendant's home for several minutes and announced themselves as the Eugene police. They could hear a person moving around inside the trailer, but no one answered the door. The officers talked to neighbors and remained on the street about 30 feet from defendant's door for a few minutes. Defendant soon opened the front door and looked around. The officers then called out to defendant to get his attention, said they wanted to talk to him, approached him on the front porch, and began to engage him in conversation.

The officers told defendant that they had received a report of a dispute at the residence. They asked why he had not come to the door and whether they could speak to the

woman inside the house. Defendant denied that there had been a dispute, told them he had not answered the door because he did not know who was there, and answered "who?" to the question about the woman. Although defendant seemed intoxicated, with slurred speech and poor balance, he responded intelligibly to the officers' questions. The officers noticed disarray in the living room immediately behind defendant, including an upside down coffee table, some other overturned furniture, and beer cans throughout the room.

While one officer, Crompton, remained at the front door with defendant, the other officer, Savage, entered the home. Crompton said, "[F]rom the door I was able to keep an eye on Mr. Shaff for officer safety purposes and I believe I actually had him have a seat on the couch just to keep things calm and keep things under control." Meanwhile, Savage directed his flashlight down a long hallway, which allowed him to see a woman lying across a bed. Savage walked to the bedroom and found defendant's girlfriend trying to hide cuts and swelling on her face.

As Crompton stood in the front doorway, or perhaps two to three feet inside, he began what he described as a general conversation with defendant on unrelated topics mixed with questions pertaining to the officers' concerns. Crompton said that his location placed him about 10 feet from defendant for the duration of their conversation—"that never changed." First Crompton asked if the couple had had an argument that night, and defendant said they always argued. Crompton asked if the argument ever became physical, and defendant said that it did not. Crompton asked how much defendant had had to drink, and he responded that he had consumed two beers. At some point before defendant was given *Miranda* warnings, he told Crompton that he wanted to go to the kitchen to get cigarettes or an ashtray. Crompton said that he had no problem with that, and defendant returned promptly to the couch and sat down again.

Meanwhile, Savage convinced the girlfriend to walk back with him through the living area, past Crompton and defendant, and outside. Crompton noticed her facial injuries, so "once Officer Savage had escorted her outside to continue talking with her I again redirected my questions and asked

again if it, the argument had become physical. I told him that she had obviously been assaulted." From the doorway, Crompton apparently turned toward Savage and the woman outside, and he could hear her denying to Savage that she had been assaulted. She maintained that she had fallen. However, Crompton turned back toward defendant and "asked him if he knew why she would say now that she had been assaulted." When defendant looked at the floor and did not reply, the officer "told him that I understood and asked him what it was that she had done to anger him." Defendant then made the statement that Crompton recorded in his police report and that defendant seeks to suppress: "[W]e were fighting about me looking at women on TV with big boobs. It's like this every night and it pisses me off. I get so mad that when I start hitting her I can't stop." No one recalls the amount of time that ensued before defendant made that statement, but the officers estimate that Savage was in the bedroom for about 10 minutes and that the entire process took about half an hour.

■■■ Article I, section 12, of the Oregon Constitution, requires that a suspect be told of the rights that safeguard him from self-incrimination, commonly known as *Miranda* warnings, when police questioning occurs in a "setting which judges would and officers should recognize to be compelling," because a suspect's responses are no longer reliably voluntary. *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990) (internal quotation marks omitted). The state bears the burden to prove by a preponderance of the evidence that a defendant's statements were voluntary. *State v. Stevens*, 311 Or 119, 137, 806 P2d 92 (1991). We review the totality of the circumstances in which police questioned a person to determine whether they rise to the level of being compelling; thus the inquiry is highly fact specific. *State v. Prickett*, 324 Or 489, 495, 930 P2d 221 (1997). The dispositive question is whether a reasonable person in the suspect's position would feel compelled to answer the officer's questions. *State v. Bush*, 203 Or App 605, 610, 126 P3d 705 (2006) (citation omitted). As we recently summarized in *Bush*, a wide variety of factors can be relevant to the conclusion that compelling circumstances exist: the number of officers; physical restraint of the suspect; the duration of the detention; the officers' use of force, sirens,

flashing lights, or display of weapons; the demeanor or language of the officers in engaging and questioning the suspect; the suspect's familiarity with the location of the questioning; and express confrontation of the suspect with incriminating evidence. *Id*. at 610-11 (citations omitted).

■ Considered in their totality here, the circumstances in which defendant made his statement had become sufficiently compelling to require the police to have given defendant *Miranda* warnings. Factors that weigh heavily in that assessment are defendant's physical restraint by the officer's presence in the doorway, coercive overtones in the conduct and the language of the questioning officer, and the confrontation of defendant with incriminating evidence. First, we agree with the trial court that defendant was not "free to go until the officers found out what was going on. * * * It is true the defendant was detained, he was not free to go and no doubt would have been stopped if he had attempted to leave." Although the state argues that defendant's freedom to go to the kitchen showed that he remained comfortable and unrestrained in his home, we interpret the trial court's conclusion about defendant's detention to be more consistent with the opposite inference. Defendant was so restrained in his own home that he reasonably felt compelled to ask the officer for permission to go to the kitchen, and the officer demonstrated his control over defendant's physical environment when he affirmatively granted permission.

The coercive overtones included the second officer walking the victim past defendant, which displayed her recent injuries, and separately questioning her. Also reasonably seen as coercive were the officer's coaxing questions and statements about the victim's condition and the "obvious" assault, inaccurate claims that the officers had responded to a report of a dispute and that the victim had accused defendant of assault, and sympathetic acknowledgment that the victim must have made defendant angry. We recognize that "police trickery or false statements, alone, may not be sufficiently coercive to result in involuntariness." *See State v. Tobias*, 131 Or App 591, 595, 887 P2d 366 (1994) (citing *State v. Burdock*, 57 Or App 601, 606, 646 P2d 91 (1982)). However, police overstatements or misstatements of the evidence against a suspect are a factor to consider because they

increase the likelihood that a reasonable person would feel a compulsion to address the officer's direct or implied accusations.

As to the factor of confrontation with incriminating evidence, "[w]hen a suspect being questioned by a police officer becomes aware that the officer has sufficient evidence to make an arrest, the circumstances become much more compelling." *Bush*, 203 Or App at 612 (citing *State v. McMillan*, 184 Or App 63, 68, 55 P3d 537 (2002), *rev den*, 335 Or 355, 67 P3d 937 (2003)). Direct confrontation with the evidence of criminal conduct also exerts pressure on a reasonable person to provide an explanation. With respect to the importance of that factor, defendant's situation is similar to several cases in which we have held that statements were made in compelling circumstances. In *McMillan*, we concluded that a vehicle stop, an officer's refusal to let the suspect use his cell phone until the issue of prostitution was resolved, one officer taking the passenger aside to gain an admission that defendant was going to pay her for sex, and the other officer directly confronting the suspect with the evidence of solicitation amounted to compelling circumstances. In *State v. Werowinski*, 179 Or App 522, 40 P3d 545, *rev den*, 334 Or 632 (2002), compelling circumstances arose when the suspect was told to sit in the police car for 10 to 15 minutes—which detention did not qualify as an arrest—to give officers a chance to question others about a fight, and then he was asked while still detained in the police car whether eyewitness statements that incriminated him were true. Finally, in *State v. Rose*, 109 Or App 378, 819 P2d 757 (1991), we held that compelling circumstances existed when a suspect who had handed the officer a loaded gun partially hidden under her purse was told to exit the passenger side of the car and come around to the driver's side near the officer, and was confronted with police statements that she was illegally carrying a concealed weapon.

In the state's view, however, *State v. Clem*, 136 Or App 37, 900 P2d 1064 (1995), where we upheld a denial of a defendant's motion to suppress, should be significant to this case. First, we note that isolated fact comparisons between cases can be misleading because a court must view evidence of each factor as part of the totality of the circumstances. In

*Clem*, the officer who stopped the defendant's vehicle first told her that, if she knew a police car was trailing her, continuing to drive "would constitute an attempt to elude a police officer." *Id.* at 39. Because he smelled alcohol on her breath, he next asked if she had been drinking, eliciting the disputed statement that she had had "a couple." He then arrested her, gave her *Miranda* warnings, and administered a breath test. *Id.* We concluded that "[t]here [was] no evidence that the questioning was prolonged or took place in an atmosphere with coercive overtones." *Id.* at 42.

In contrast here, the officer asked repetitive questions about assault in an atmosphere with coercive overtones. Officer Crompton testified that "I again redirected my questions and asked again if it, the argument had become physical. I told him that she had obviously been assaulted." Crompton then "asked him if he knew why she would say now that she had been assaulted" and "what it was that she had done to anger him." The questions were asked in circumstances in which defendant knew the victim was being interviewed and that Crompton, but not defendant, could overhear her answers. We conclude that in this case the use of confrontation with incriminating evidence, within the totality of the circumstances, was coercive and was more analogous to *MacMillan, Werowinski*, and *Rose* than to *Clem*.

Although confrontation with evidence of a crime can be significant, as in this and similar cases, we emphasize that we consider the totality of the circumstances because no single factor standing alone requires a particular result. *See Werowinski*, 179 Or App at 532 n 5. We conclude that the state did not meet its burden here to show that a reasonable person would not have felt compelled to answer the questions of the police under the circumstances, absent an understanding of his *Miranda* rights.

■■  The state argues that any error in admitting defendant's inculpatory statement should be deemed harmless because of the weight of the evidence at trial. A trial court error is deemed harmless if there is little likelihood that it affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). However, the statement at issue was defendant's only admission in connection with count two that he

had struck his girlfriend. A defendant's direct admission bears an important relationship to a jury's determination of its verdict, *see id.* at 34, and therefore we cannot say that allowing the statement to be introduced at trial had little likelihood of affecting the verdict on the second count. The error was not harmless.

Conviction on second count reversed and remanded; otherwise affirmed.