Argued and submitted August 18, 2006, reversed in part and remanded for a new trial on Counts 1 through 13; otherwise affirmed February 14, 2007

STATE OF OREGON,
*Respondent,*

*v.*

COLIN ALEXANDER SAUNDERS,
*Appellant.*

C010764CR, C013567CR;
A119606 (Control), A119607

153 P3d 144

Peter Gartlan, Chief Defender, Legal Services Division, argued the cause for appellant. With him on the brief was Peter A. Ozanne, Executive Director, Office of Public Defense Services.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Ortega and Rosenblum, Judges.

ROSENBLUM, J.

### ROSENBLUM, J.

Defendant appeals his convictions of four counts of first-degree rape, ORS 163.375 (Counts 1 through 4), three counts of first-degree sexual abuse, ORS 163.427 (Counts 5 through 7), six counts of first-degree sodomy, ORS 163.405 (Counts 8 through 13), and three counts of first-degree criminal mistreatment, ORS 163.205 (Counts 14 through 16). The victims of the offenses were defendant's girlfriend's three children, B, J, and C. Defendant raises five assignments of error. We write primarily to address defendant's argument that the trial court erred in denying his motion to suppress evidence of statements he made to police while he was being interviewed at his home and before he was advised of his *Miranda* rights. We agree with defendant that the circumstances under which he made those statements were compelling. Therefore, the trial court erred by admitting them. We conclude that the error was not harmless as to Counts 1 through 13, but that it was harmless as to Counts 14 through 16. Accordingly, we reverse in part and remand the case for a new trial on Counts 1 through 13.

The relevant facts are undisputed. Detectives Marley and Chapman, both armed but in plain clothes, went to defendant's house to investigate B's allegations that defendant had sexually abused her. When defendant answered the door, the detectives identified themselves and asked to come inside. Defendant invited them in, and Marley asked if they could sit at the kitchen table to talk. Defendant sat down at the table across from Marley. Chapman remained standing next to the kitchen counter. Defendant had a partially empty glass of beer with him, but he said that it was all that he had had to drink that day. Marley did not think that he was intoxicated.

After sitting down at the table, Marley told defendant that the detectives were there to talk to him about B's allegations. During the interview, defendant stood up. Marley told defendant to "[p]lease sit down." As Marley later explained at the suppression hearing, he "wasn't comfortable with [defendant] standing." When defendant rose to get some water and his cigarettes, Chapman told defendant to please

sit down, and said that she would get the items. Defendant sat down, and he and Marley continued talking while Chapman brought defendant some water and his cigarettes. Chapman then stepped into the living room and used her hand-held radio to request a backup officer because, as she later testified, she was "concerned" "that [defendant] might flee." The interview lasted about one and one-half hours, and defendant remained seated during that entire time. Although Marley and Chapman did not intend to arrest defendant when they went to his house to question him, they decided to do so based upon defendant's responses and physical reactions to the questioning, the details of which are described later in this opinion. After defendant was transported to the police station from his house, Marley advised him of his *Miranda* rights.

Before trial, defendant sought to suppress evidence of the statements he made to Marley and Chapman at his home, arguing that the interview took place under compelling circumstances and thus he should have been informed of his *Miranda* rights before being questioned. The state presented testimony from Marley, Chapman, and the two officers whom Chapman had summoned to the scene.[1] The trial court denied the motion to suppress, concluding that there was "nothing that leads me to believe that from his perception, [defendant] wasn't free to leave" during the interview.

The case was then tried to a jury. The state offered Marley's testimony about the interview with defendant. We quote his trial testimony at length because it is key to our determinations regarding both compelling circumstances and whether defendant was prejudiced by the admission of the testimony:[2]

---

[1] Those two officers testified that defendant's wife arrived at the house during the interview, but they did not physically prevent her from entering. Defendant's wife testified that the officers barred her from entering, but she did not otherwise controvert their testimony. The trial court found that she was mistaken. That factual finding is not significant, however, to our consideration of the issue of compelling circumstances because there was no evidence that defendant was aware of what was going on outside while he was being interviewed.

[2] Marley's trial testimony regarding his interview with defendant did not differ from his testimony at the suppression hearing in any significant respect.

"When I asked him if he took care of [B and J] when [their mother] wasn't there, I noticed that his hands started shaking.

"* * * * *

"I asked him about their activities at the apartment. I said, 'Did you guys drink alcohol?' He said they did. They drank quite a bit. I asked him if illegal drugs were used when he lived with them and he said there was. That occurred. I asked him what kind of illegal drugs. He said he and [the children's mother] would smoke cocaine but clarified that it did not occur frequently because of a shortage of money. They didn't have a lot of money to buy the cocaine.

"He offered his life had changed since then. He told me he's quit using drugs and he had quit drinking alcohol. However, there was a glass of beer sitting there that had just a little bit out of the top and we asked about that, asked him if he had been drinking that day, and he said this was his first drink and he only had had a sip.

"* * * * *

"I told him we were there today to talk to him specifically about some things that happened while he was living with [the children and their mother] * * *, and I asked him when [their mother] wasn't there or maybe even when she was there, did you or would you have bathed the girls? His voice at that point started to * * * tremble, and he said that he did.

"I asked him, 'Did you ever touch the girls inappropriately?' He didn't answer yes or no. He said, 'I like older women.'

"* * * * *

"I then told him that both [B and J] had been seen by a specialist the day before * * * and some statements had been made to the specialist, the doctors, about some inappropriate touching or sexual conduct that had taken place. And I told him, 'I interview people a lot on this kind of stuff,' that that was my assignment, and I told him, 'Sometimes there [are] explanations for why these things happen.' And I told him, 'Sometimes it's because of drug use and alcohol use.' And I went on to tell him things he had mentioned

about being unemployed, the financial problems, the relationship problems with him and [their mother] also might be a factor as to why this occurred.

"Mr. Saunders said, 'I don't think I did anything to [B or J].'

"* * * * *

"I told him there must be some explanation for what was going on. * * * I talked about [B's] statement, about the detailed statement, and told him I couldn't think of a motive. And I asked him, 'Can you think of a motive why these girls would make an allegation against you like this, when you said you all got along and the girls liked you?'

"I asked him if he was sorry for what happened and if he was sorry, it was important for him to tell me that so that I could document it.

"He said as far as he could recall, he hadn't done anything to the girls. He asked me, 'Why would I touch a child when I have a girlfriend and I could go to my girlfriend?'

"He went on to say that even if they thought he did something like this, he was in a no-win situation. He said if he said he didn't remember, he realized that didn't help him. Then he said that knowing himself then and knowing himself now, that he wouldn't do something like this and he couldn't admit to something if he couldn't remember it.

"I recall telling him that the allegation was significant, that it would be significant if somebody is accusing you of sexually touching a child and that I believe it would be something that you would remember. It wouldn't be something that you would simply forget if you molested or committed sodomy on a child.

"At that point, I went into real detail about what [B] had said and I actually pulled out these two pieces of paper which [B] actually wrote on here in front of me at CARES, that [defendant] did this and his penis was wet and cold and he put his penis in her mouth and that he put his penis [in] her vaginal area.

"* * * * *

"When I showed him this, I went into detail of what [B's] statement was. She said at least 10 times, he tried to put his penis in her front private. At least 10 times he had—he

put her mouth on his penis. He rubbed her on her bottom. And he, at least 10 times, had put his mouth on her front private.

"When I told him this, his voice began to tremble and he said he couldn't believe this was happening to him. * * * I meant to say body. His hands had been trembling earlier, his voice had, then he was noticeably shaking when we talked about the specific allegations that [B] had made to the doctors.

"* * * * *

"[A]fter telling him what [B] said, he said even if it happened, he couldn't tell us because he couldn't remember it, himself. I said, 'Well, could the use of alcohol and the cocaine, smoking of cocaine be affecting what you can remember?' He said, 'I don't know.'

"I asked him if he was sorry this happened and he said if it did happen, he was sorry. And then he said, 'If this did happen, what's going to happen to me?'

"I told him I really didn't know. There [are] a lot of variables. I didn't know what was going to happen, if he would be here today or what was going to happen.

"I told him at that point that I wanted him to be real truthful with me and tell me the truth and he said he just couldn't believe that he would do something like this to someone. He said he was sorry about this—-I'm sorry. Oh, he said if he said he was sorry about this, that it wouldn't help him if he didn't remember doing it.

"* * * * *

"Mr. Saunders then asked me if I thought he did it and I told him yes. * * * I said yes. And he then asked Detective Chapman, 'Do you think I did this?' And she said yes.

"We explained to him that we thought there might be an explanation for what happened and he said that he was a good person, that he wasn't evil and he wouldn't do something evil to a child.

"I said, 'Good people make mistakes all the time.'

"He said, 'If I made the mistake, what's going to happen to me? Am I going to go to prison?'

"I told him again, 'I can't answer that. I don't know what's going to happen down the road.'

"I told him it was important, though, if it happened, that he tell me that he was sorry that it happened. He said even though he was having a lot of problems back then when they lived together, he liked to think he was a good person and that if he thought he did do this, what's alleged, that he would break down and cry.

"I told him, 'Well, it appears that you're having a reaction from what I'm telling you. You're shaking, your voice is trembling.'

"He told me he was scared [of] what was going to happen to him and if he remembered doing something like this, he'd tell us. And he said, 'If something like this did happen, I'm sorry.' "

Defendant testified on his own behalf. He maintained that he had not sexually abused B or J, but he admitted that when B, J, or C misbehaved while in his care he would "smack [them] on the head" with a spoon.[3] In closing arguments, the prosecutor highlighted Marley's testimony about defendant's statement that he did not recall abusing B, telling the jury, "[Y]ou know whether or not you did sexually abuse a child. You know." The jury convicted defendant of all of the charges against him.

On appeal, defendant argues that the trial court erred in denying his motion to suppress evidence of his statements to Marley and Chapman because the circumstances of the interview were compelling. We review the trial court's conclusion that the circumstances of the interview were not compelling for errors of law. *State v. Werowinski*, 179 Or App 522, 529, 40 P3d 545, *rev den*, 334 Or 632 (2002).

Article I, section 12, of the Oregon Constitution requires that a suspect be told of the rights that safeguard him from self-incrimination, commonly known as *Miranda* rights, when a suspect is in custody or, even if the suspect is not in formal custody, when police questioning occurs in a "setting which judges would and officers should recognize to

---

[3] In his opening brief, defendant acknowledges that those facts constitute criminal mistreatment.

be compelling." *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990) (internal quotation marks omitted). When a suspect is interrogated under compelling circumstances without the benefit of *Miranda* warnings, statements he makes during the interrogation are subject to suppression. *See, e.g., State v. Shaff*, 209 Or App 68, 72, 146 P3d 389 (2006). Compelling circumstances exist if, in the totality of the circumstances, a reasonable person in the defendant's position would have felt compelled to answer the officer's questions. Such circumstances may include the suspect's familiarity or lack thereof with the location of the questioning, any physical restraint of the suspect, the number of officers present, the demeanor or language of the officers, the duration of the detention, the officer's use or nonuse of force, sirens, or flashing lights, any display of weapons, and any direct confrontation of the suspect with incriminating evidence. *Id.* at 72-73. Three of these are most pertinent here: location, physical restraint, and confrontation with incriminating evidence.

■ The state contends that "[t]he contact here * * * was about as familiar and as nonthreatening a location as was possible" because it took place in defendant's home. We agree that the location, by itself, favors the conclusion that the circumstances were not compelling. That factor, however, is not dispositive, because compelling circumstances may exist even though the questioning occurs in a familiar setting. In *Shaff*, for example, police officers responded to a report of a dispute at the defendant's residence and questioned the defendant in his living room. 209 Or App at 70-72. At one point during the questioning, the defendant asked to retrieve his cigarettes from the kitchen, and the officer assented to his request. We rejected the state's argument that the "defendant's freedom to go to the kitchen showed that he remained comfortable and unrestrained in his home" because the "[d]efendant was so restrained in his own home that he reasonably felt compelled to ask the officer for permission to go to the kitchen, and the officer demonstrated his control over defendant's physical environment when he affirmatively granted permission." 209 Or App at 73.

■ Although Marley and Chapman were not in uniform and did not display their weapons, they did not permit defendant to stand, let alone move about his home. That restraint

of his physical movement—for approximately one and one-half hours—exhibited the officers' control over defendant's physical environment. *Cf. State v. Dinsmore*, 182 Or App 505, 515, 49 P3d 830 (2002), *aff'd*, 342 Or 1, 147 P3d 1146 (2006) (defendant was in compelling circumstances because she "was told to remain at the [accident] scene, was placed under an officer's supervision for at least an hour and a half [in a patrol car], and was specifically denied permission to leave to go to the bathroom"). We conclude that a reasonable person would not feel free to leave after having been asked to remain seated, even—or especially—in his own home.[4]

■ In addition to controlling defendant's physical movements for a significant period of time, Marley and Chapman also pressured defendant by confronting him with highly incriminating evidence, namely, the pictures drawn by B describing the ways in which she was allegedly assaulted, and asked defendant to explain why the children had accused him. "Direct confrontation with evidence of criminal conduct * * * exerts pressure on a reasonable person to provide an explanation," particularly where the officer specifically asks the suspect for one, as Marley did repeatedly. *See Shaff*, 209 Or App at 73-75 (noting that "the officer asked repetitive questions" when concluding that the confrontation with incriminating evidence contributed to the existence of compelling circumstances). Marley and Chapman both told defendant that they believed that he was guilty, and, at least three times during the interview, they stressed the importance of his expressing remorse, despite defendant's repeated denials of the allegations. Such questioning exerted pressure on defendant to apologize for conduct that he maintained he had not engaged in, resulting in his statements to the effect that "if something like this did happen, I'm sorry."

---

[4] Although the trial court found that there was no evidence "that from his perception, [defendant] wasn't free to leave," defendant was not required to offer such evidence because the state bore the burden of proving that his statements were voluntarily made. *See Shaff*, 209 Or App at 72. The trial court correctly ascertained that there was no evidence presented regarding what defendant believed, but that lack of evidence does not resolve the matter because we consider whether a reasonable person would have believed that he was not free to leave. That is a legal, not a factual, question.

In the totality of those circumstances, we conclude that a reasonable person would have felt compelled to answer the questions of the police. It follows that the trial court erred in denying the motion to suppress evidence of defendant's statements.

■ The state contends that any error in denying the motion was harmless because defendant admitted at trial that he knew his *Miranda* rights at the time he was questioned. For this proposition, the state unavailingly relies on *State ex rel Juv. Dept. v. Cook*, 325 Or 1, 932 P2d 547 (1997). In *Cook*, the Supreme Court held that a youth offender's testimony at an adjudicatory hearing, where "he made several statements that were just as incriminating as the portion of [his] statements to [police] that the juvenile court had already admitted," "eliminated the possibility that the court's earlier ruling on the motion to suppress harmed him." 325 Or at 5. *Cook* did not address the question of the defendant's familiarity with *Miranda* warnings. Although a defendant's familiarity with law enforcement procedures may affect our analysis of whether the circumstances surrounding the questioning were compelling, *see State v. Soen*, 132 Or App 377, 888 P2d 583, *rev den*, 321 Or 47 (1995), we have never held that a suspect's prior knowledge of *Miranda* rights disposes of the police's duty to advise a suspect of them. Moreover, the present case is not analogous to *Cook* because defendant did not offer trial testimony that was "just as incriminating" as his statements to Marley and Chapman. In all events, no evidence of defendant's knowledge of his rights was presented at the suppression hearing.

■ The state also contends that any error in denying the motion to suppress was harmless because there is little likelihood that the error affected the verdict. *See* Or Const, Art VII (Amended), § 3 (reviewing court shall affirm a conviction despite legal error during trial if the error was harmless); *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (if the particular issue to which the error pertains has no relationship to the jury's determination of its verdict, then there is little likelihood that the error affected the verdict). We agree with the state with respect to the convictions for criminal mistreatment. Defendant admitted on the stand to facts amounting to criminal mistreatment of C, B, and J, and he concedes

on appeal that there is little likelihood that the error affected those convictions. *See Cook*, 325 Or at 5. We conclude, however, that the error was not harmless with respect to the remaining convictions.

Marley's testimony regarding the statements that defendant made during questioning, before he was given *Miranda* warnings, adversely affected defendant's credibility with respect to his denials of B's allegations that she was sexually abused by defendant, and thus also affected whether the jury believed defendant's denials of J's similar allegations. Defendant's statements that he did not recall abusing B but was sorry if he had were likely viewed by the jury as an implicit admission of guilt, particularly given Marley's testimony that "[i]t wouldn't be something that you would simply forget if you molested or committed sodomy on a child" and the prosecutor's closing argument that "you know whether or not you did sexually abuse a child. You know." Given that the central issue in the case was whether the abuse occurred, we cannot say that there was little likelihood that the error in admitting Marley's testimony, upon which the prosecutor later relied to question defendant's truthfulness, affected "the jury's all-important assessment of credibility." *State v. Irons*, 162 Or App 512, 524, 987 P2d 547 (1999), *rev den*, 330 Or 120 (2000); *see also State v. Coen*, 203 Or App 92, 102-03, 125 P3d 761 (2005), *rev den*, 341 Or 141 (2006) (holding that admission of the defendant's statement made in compelling circumstances and without the benefit of *Miranda* warnings was not harmless error because the state relied on the statements during closing argument). Accordingly, the trial court's error in admitting the testimony was not harmless as to Counts 1 through 13.

Defendant also assigns error to the trial court's admission of a medical expert's opinion diagnosing B as having been sexually abused, arguing that the state failed to lay an adequate foundation for her testimony. Because we reverse and remand on defendant's first assignment of error, we need not address his second assignment. Having ruled that the trial court should have suppressed all of defendant's statements made at his home, we need not address defendant's third and fourth assignments of error that certain statements made at that time were inadmissible.

We also reject defendant's argument that the trial court erred by failing to instruct the jury that they must agree on a particular discrete act of misconduct to convict defendant. *See State v. Boots*, 308 Or 371, 378-81, 780 P2d 725 (1989). Defendant did not request such an instruction; he will have the opportunity to do so on remand with respect to Counts 1 through 13.

With respect to Counts 14 through 16, defendant acknowledges in his opening brief that he admitted to facts amounting to criminal mistreatment of C, B, and J and, thus, to the conduct constituting each relevant count. Even assuming that it was error to fail to give a concurrence instruction as to the criminal mistreatment counts, that error was harmless.

Reversed in part and remanded for a new trial on Counts 1 through 13; otherwise affirmed.